ORAL ARGUMENT NOT YET SCHEDULED
Nos. 25-1255 & 25-1268 (consolidated)

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

READING INTERNATIONAL, INC., *Petitioner*,
v.
SURFACE TRANSPORTATION BOARD and
UNITED STATES OF AMERICA, *Respondents*, and
CITY OF PHILADELPHIA, *Intervenor.*

ERIC S. STROHMEYER, *Petitioner*,
v.
SURFACE TRANSPORTATION BOARD and
UNITED STATES OF AMERICA, *Respondents*, and
CITY OF PHILADELPHIA, *Intervenor.*

ON PETITIONS FOR REVIEW OF AN ORDER OF
THE SURFACE TRANSPORTATION BOARD

# RESPONDENTS' JOINT BRIEF
# IN RESPONSE TO PETITIONER STROHMEYER'S BRIEF


ROBERT B. NICHOLSON
AVI GRUNFELD
Attorneys
Antitrust Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C.  20530

ANIKA S. COOPER
Chief Counsel
SCOTT M. ZIMMERMAN
Acting Deputy Chief Counsel
ADAM M. KRESS
Associate Counsel - Litigation
ERIK G. LIGHT
Attorney
Surface Transportation Board
Washington, D.C.  20423-0001
(202) 919-8988


September 3, 2026

## CERTIFICATES AS TO PARTIES, RULINGS, AND RELATED CASES

**Parties and Amici**

All parties, intervenors, and amici appearing in this Court are listed in the Brief for petitioner Reading International, Inc. in No. 25-1255.

The parties who appeared before the Surface Transportation Board are: Reading International, Inc., and City of Philadelphia. Eric S. Strohmeyer sought to participate in the proceedings below, but the Board denied him permission to do so and struck his single filing.

**Decisions Under Review**

The decision under review is: *City of Philadelphia—Petition for Declaratory Order*, FD 36768, 2025 WL 2732904 (STB served Sept. 24, 2025) (J.A. 272-86). No other official citation exists.

**Related Cases**

These consolidated cases were not previously before this Court or any other court. There are no related cases involving substantially the same issues pending in this Court or any other court.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

GLOSSARY ........ vii

INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 2

STATUTES AND REGULATIONS ........ 2

ISSUES PRESENTED FOR REVIEW ........ 2

STATEMENT OF THE CASE ........ 3

SUMMARY OF ARGUMENT ........ 6

ARGUMENT ........ 9

I. STROHMEYER MAY NOT SEEK JUDICIAL REVIEW OF THE BOARD'S DECISION ........ 9

A. Strohmeyer Lacks Article III Standing to Challenge the Board's Decision ........ 9

B. Strohmeyer Is Not a "Party Aggrieved" By the Board's Decision ........ 13

II. THE BOARD HAD JURISDICTION TO DECIDE THE CITY'S PETITION ........ 15

III. THE BOARD'S PROCESSES WERE SOUND ........ 22

IV. THE BOARD DETERMINATION WAS IMPARTIAL ........ 28

CONCLUSION ........ 33

CERTIFICATE OF COMPLIANCE ........ 34

CERTIFICATE OF SERVICE ........ 35

ADDENDUM

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*In re Bartle*,
560 F.3d 724 (7th Cir. 2009) .......................................................................28

*Board of Regents v. Roth*,
408 U.S. 564 (1972).....................................................................................27

*Cinderella Career & Finishing Schools, Inc. v. FTC*,
425 F.2d 583 (D.C. Cir. 1970).....................................................................32

*City of Jersey City v. Consolidated Rail Corp.*,
668 F.3d 741 (D.C. Cir. 2012)................................................................12, 13

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)...............................................................................6, 9, 10

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985).....................................................................................27

*Consol. Rail Corp. v. STB*,
571 F.3d 13 (D.C. Cir. 2009)................................................................7, 16, 20

*Consol. Rail Corp. v. United States*,
883 F. Supp. 1565 (Reg'l Rail Reorg. Ct. 1995) ......................................16, 21

*Fast Food Workers Comm. v. NLRB*,
31 F.4th 807 (D.C. Cir. 2022).......................................................................32

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009).....................................................................................25

*Langeman v. Garland*,
88 F.4th 289 (D.C. Cir. 2023).......................................................................27

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)...............................................................................9, 10, 12

*Matson Navigation Co. v. DOT*,
77 F.4th 1151 (D.C. Cir. 2023)....................................................................14

*Nat'l Wildlife Fed'n v. ICC*,
850 F.2d 694 (D.C. Cir. 1988)......................................................................11

*NRC v. Texas*,
605 U.S. 665 (2025)...............................................................................6, 13, 14

*Pension Benefit Guar. Corp. v. LTV Corp.*,
496 U.S. 633 (1990)........................................................................................23

*R.R. Comm'n of Tex. v. United States*,
765 F.2d 221 (D.C. Cir. 1985).................................................................8, 23

*Sea-Land Serv., Inc. v. United States*,
683 F.2d 491 (D.C. Cir. 1982)......................................................................23

*Sierra Club v. Morton*,
405 U.S. 727 (1972)........................................................................................10

*United States v. Holland*,
519 F.3d 909 (9th Cir. 2008) .......................................................................31

*United States v. L.A. Tucker Truck Lines, Inc.*,
344 U.S. 33 (1952).....................................................................................22, 30

*United States v. Thomas*,
97 F. 3d 1499 (D.C. Cir. 1996)....................................................................12

**AGENCY DECISIONS**

*Alleghany Valley R.R.—Petition for Declaratory Order—William Fiore*, FD 35388, 2011 WL 1546589 (STB served Apr. 25, 2011) ...................24

*Cal. High-Speed Rail Auth.—Constr. Exemption—in Fresno, Kings, Tulare, & Kern Cntys., Cal.*, FD 35724 (Sub-No. 1), 2014 WL 3973120 (STB served Aug. 12, 2014) .............................................................31

*City of Austin, Tex.—Acquisition—S. Pac. Transp. Co.*, FD 30861(A), 1986 WL 1166762 (ICC served Nov. 4, 1986) ..................................................19

*City of Philadelphia—Petition for Declaratory Order*, FD 36768, 2025 WL 2732904 (STB served Sept. 24, 2025) ....................4, 5

*CSX Corp.—Control & Operating Leases/Agreements—Conrail Inc.*, FD 33388, 1997 WL 575371 (STB served Sept. 18, 1997) ....................31

*Great Walton R.R.—Petition for Declaratory Order*, AB 1242 (Sub-No. 1), 2026 WL 562267 (STB served Feb. 27, 2026) ....................25

*Joseph R. Fox—Petition for Declaratory Order*, FD 35161, 2009 WL 1383503 (STB served May 18, 2009), *aff'd sub nom. Fox v. STB*, 379 Fed. Appx. 767 (10th Cir. 2010)....................20

*Kan. & Okla. R.R.—Lease & Operation Exemption with Interchange Commitment—Union Pac. R.R.*, FD 36849, 2026 WL 795881 (STB served Mar. 20, 2026) ....................25

*Louisville & Jefferson Cnty. Riverport Auth.—Petition for Declaratory Order*, FD 36463, 2021 WL 4940260 (STB served Oct. 22, 2021) ....................24

*Norfolk S. Corp.—Acquisition of Control—Norfolk & Portsmouth Belt Line R.R.*, FD 36836, 2026 WL 1147628 (STB served Apr. 6, 2026) ....................25

*Sunflower State Indus. Ry.—Petition for Declaratory Order*, FD 36714 (Sub-No. 1), 2025 WL 945785 (STB served Mar. 28, 2025)....................25

*Supplemental Standards of Ethical Conduct for Emps. of the ICC*, 9 I.C.C.2d 838 (1993) ....................8, 30

*Town of Smithtown—Petition for Declaratory Order*, FD 36575 (Sub-No. 1), 2024 WL 757039 (STB served Feb 23, 2024) ....................24

## STATUTES

5 U.S.C. § 554(a) ....................23

5 U.S.C. § 554(c) ....................23

16 U.S.C. § 1247(d) ....................6, 10, 11, 12

28 U.S.C. § 2344....................1, 6, 13

45 U.S.C. § 719(b)(2) ........ 15

45 U.S.C. § 719(e)(2) ........ 7, 16

**REGULATIONS**

5 C.F.R. § 2635.502(a)(2) ........ 5

5 C.F.R. § 2635.502(a)(3) ........ 5

5 C.F.R. § 2635.502(c) ........ 30

5 C.F.R. § 2635.502(d) ........ 31

5 C.F.R. § 2635.502(e) ........ 30

5 C.F.R. § 5001.103 ........ 31

49 C.F.R. § 1011.2(b) ........ 24

49 C.F.R. § 1011.7 (2025) ........ 24

49 C.F.R. § 1011.7 (2026) ........ 24

49 C.F.R. § 1011.7(a)(2)(vi) ........ 23

49 C.F.R. § 1101.2(d) ........ 13

49 C.F.R. § 1104.13(a) ........ 26

49 C.F.R. § 1104.13(c) ........ 25

49 C.F.R. § 1152.29(c) ........ 11

49 C.F.R. § 1152.29(d) ........ 11

**OTHER AUTHORITIES**

https://baynews9.com/fl/tampa/news/2026/07/15/booker-creek-trail-railroad ........ 11

U.S. Const. art. III, § 2 ........ 9

## GLOSSARY

| | |
|---|---|
| 3R Act | Regional Rail Reorganization Act of 1973 |
| APA | Administrative Procedure Act |
| City | City of Philadelphia |
| Conrail | Consolidated Rail Corporation |
| J.A. | Joint Appendix |
| Reading | Reading International, Inc. |
| SEPTA | Southeastern Pennsylvania Transportation Authority |
| STB | Surface Transportation Board |

## INTRODUCTION

This case arises from a dispute before the Surface Transportation Board between the City of Philadelphia and petitioner Reading International over whether a viaduct in the city owned by Reading was removed from federal jurisdiction in 1984 when Conrail, the last rail carrier authorized to operate over it, abandoned its freight operating easement.

Into this dispute stepped Eric Strohmeyer, in an effort to derail the proceeding, by arguing that the Board had no jurisdiction to decide the dispute. Since, however, Strohmeyer had no stated or apparent connection to the viaduct or the dispute about it, the Board at the request of the City refused to admit him as a party. Strohmeyer has now sought judicial review—repeating his argument that the Board lacked jurisdiction and adding a variety of other claims of Board error.

As Reading succinctly told the Court in initially opposing Strohmeyer's motion to file his brief out of time, Strohmeyer "never had any business being in this case." Reading Opp'n to Strohmeyer's Motion to File Br. Out of Time 2 (Apr. 20, 2026). He lacks Article III standing for failure to allege any cognizable injury-in-fact. He lacks Hobbs Act standing because he is not a "party aggrieved" by the Board's order (28 U.S.C. § 2344) since he was not a party before the Board. Accordingly, his review petition is not properly before the Court and

should be dismissed. To the extent that the Court nonetheless may wish to consider his petition on the merits, his arguments are unsound, and the petition should be denied.

## JURISDICTIONAL STATEMENT

As discussed below, this Court lacks jurisdiction over No. 25-1268 because petitioner Strohmeyer lacks standing to challenge the Board's decision.

## STATUTES AND REGULATIONS

All applicable statutes, except for those contained in the Addendum to this brief, are contained in the addenda to the briefs in No. 25-1255.

## ISSUES PRESENTED FOR REVIEW

1. Whether Strohmeyer may seek judicial review of the Board's decision where he lacks a concrete interest in the Viaduct sufficient to give him Article III standing and where he was not a "party aggrieved" under the Hobbs Act.

2. Whether the Board had jurisdiction to determine the regulatory status of the Viaduct where the nature or extent of Reading's interests in the Viaduct was not at issue.

3. Whether the proceeding was conducted fairly and in accordance with the APA when the Board had sufficient information to render its decision, the parties, as well as Strohmeyer, had a meaningful opportunity to be heard, and

Strohmeyer's ethics concern was satisfactorily addressed under the applicable regulations.

## STATEMENT OF THE CASE

Respondents adopt the Statement of the Case set forth in their brief filed on June 22, 2026, supplemented as follows.

On April 19, 2024, the City petitioned the Board to declare that a viaduct in downtown Philadelphia on which there had once been railroad tracks (the Viaduct) was no longer under the agency's jurisdiction. Petition 1 (J.A. 3). In its petition, the City alleged that the owner of the Viaduct, Reading, was not a rail carrier and "possesse[d] no authority to operate a rail line." *Id*. (J.A. 3). Reading did not contest these allegations and in fact confirmed that it was "not a rail carrier." Reading Reply to Motion to Strike 2, 4 (J.A. 262, 264). Reading instead opposed the City's petition on the ground that Reading had retained "property interests in the Viaduct," Reply to Petition 6, 10 (J.A. 73, 77), and that "[w]hile Conrail relinquished its easement consisting of its operations related to the Viaduct, that relinquishment did not operate to abandon the entirety of the Viaduct property consisting of Reading's ownership interests as well." *Id.* at 11 (J.A. 78).

On August 1, 2024, Eric Strohmeyer filed a Notice of Intent to Participate, Reply, and Motion to Dismiss (Motion to Dismiss) (J.A. 208-44). Although Strohmeyer claimed to be an "interested party," he identified no interest in the

proceeding or any connection to the Viaduct. *Id.* at 1 (J.A. 209.) Strohmeyer argued that the Board lacked jurisdiction to resolve the City's petition because the District Court for the District of Columbia (as successor to the Special Court) has exclusive jurisdiction to determine the "extent and nature" of the interests conveyed by Reading Railroad to Conrail. *Id*. at 1-2 (J.A. 209-10). Strohmeyer also questioned whether Board Member Schultz had a conflict of interest in the proceeding based on her past employment with the Southeastern Pennsylvania Transportation Authority (SEPTA), because SEPTA once had an interest in the property at issue. *Id*. at 16-18 (J.A. 224-26). He demanded that the Board address the ethics issue "in a transparent and open manner." *Id*. at 16 (J.A. 224).

The City moved to strike Strohmeyer's filing, which the Board did on the ground that Strohmeyer had not "demonstrated an interest that would warrant the Board permitting his participation as a party." *City of Philadelphia—Petition for Declaratory Order*, FD 36768, 2025 WL 2732904, at *5 (STB served Sept. 24, 2025) ("*Decision*") (J.A. 276). Nevertheless, the Board confirmed that "[n]o questions implicating the Special Court's jurisdiction are at issue in this proceeding." *Id.* at 6 (J.A. 277). As the Board explained, the City accepted Reading's characterization of its retained property rights, and Reading itself did not "claim to be a carrier or to have a common carrier obligation over the Ninth Street Branch." *Id.* (J.A. 277). The Board concluded that it had jurisdiction to

resolve the City's petition because there was no dispute over the extent and nature of Reading's retained property rights. *Id.* (J.A. 277). Rather, the only dispute between the parties was whether "Reading's retained ownership interest remain[ed] under the Board's jurisdiction" after Conrail abandoned its freight operating easement, a question that could be "addressed without having to interpret the [Final System Plan], the Special Court's conveyance orders, or the Deed." *Id.* (J.A. 277).

Pursuant to the Board's regulations, in a separate concurring opinion Member Schultz evaluated the alleged conflict of interest under the applicable executive branch and Board standards. First, she concluded that the rule governing conflicts arising from past employment was not implicated because SEPTA was not a party to the proceeding and also because she was no longer in a "covered relationship" with SEPTA since she had not worked there for over a year. *Decision* 14-15 (J.A. 285-86) (citing 5 C.F.R. § 2635.502(a)(2)). Second, Member Schultz applied the general ethics catch-all provision to conclude that no reasonable person otherwise would likely question her impartiality because SEPTA was not party, she had resigned her position with SEPTA more than four years previously, and SEPTA had relinquished its property rights in the Ninth Street Branch in 2010. *Id*. at 15 (J.A. 286) (citing 5 C.F.R. § 2635.502(a)(3)).

## SUMMARY OF ARGUMENT

Strohmeyer's review petition should be dismissed for two independent reasons, or, in the alternative, denied on its merits.

First, Strohmeyer lacks Article III standing because he has not demonstrated an injury-in-fact. That the Viaduct may no longer be available for future rail service affects him no differently than a member of the general public and is not sufficiently particularized to support Article III standing. And his purported interest in acquiring the Viaduct under Section 8(d) of the National Trails System Act, 16 U.S.C. § 1247(d), is too attenuated since it would require an agreement on price and other terms from Reading and for Strohmeyer to assume liability for the property and pay taxes on it. Strohmeyer has presented no evidence that either of these things are likely to occur, much less that they are "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Second, Strohmeyer cannot petition for review here because he is not a "party aggrieved" under the Hobbs Act and thus lacks statutory standing under the Act. 28 U.S.C. § 2344. The Board did not "admit [Strohmeyer] as a party" under the applicable Board regulations, *see NRC v. Texas*, 605 U.S. 665, 688 (2025), and his single pleading was struck, because he failed to identify any interest in the Viaduct or agency proceeding that would justify his participation. Strohmeyer

does not claim that the Board erred in reaching this conclusion, which is fatal to his claim for status in this Court.

Third, even if Strohmeyer's petition were properly before this Court, his merits arguments are baseless. The Board had jurisdiction to resolve the underlying dispute. The Special Court's exclusive jurisdiction was not implicated because the City did not seek a determination regarding the nature of the property rights conveyed by Reading's predecessor to Conrail, and those retained by Reading, and Reading's opposition confirmed no such determination was necessary. Indeed, Reading did not argue it retained a common carrier obligation; rather, it expressly told the Board it was not a rail carrier. Given that no "interpretation of the [Final System Plan] or the Special Court's conveyance order under 45 U.S.C. § 719(e)(2)" was necessary, *Consol. Rail Corp. v. STB*, 571 F.3d 13, 20 (D.C. Cir. 2009) ("*Conrail v. STB*"), the Board had authority to decide the question presented: whether the Viaduct remained under the agency's jurisdiction after Conrail abandoned its easement in 1984, where Conrail was the only entity with a common carrier obligation over the property.

Fourth, Strohmeyer's strained argument that the Board should have employed more process (e.g., instituted a proceeding, published notice in the *Federal Register*, and established a procedural schedule) is forfeited because neither he nor either of the parties asked the Board for more process. And in any

event, the Board has substantial procedural flexibility under the Administrative Procedure Act to address declaratory order petitions, like that filed by the City. *See R.R. Comm'n of Tex. v. United States*, 765 F.2d 221, 228 (D.C. Cir. 1985). The Board had sufficient information to render its decision, *id.*, and the process it employed was consistent with Board regulations and precedent. The parties, as well as Strohmeyer, had a meaningful opportunity to be heard.

Lastly, Strohmeyer's argument that his purported ethics concern was not adequately addressed is frivolous. As Member Schultz explained in detail in her concurring opinion, there is no conflict of interest arising from her past employment with SEPTA as SEPTA has no interest in the Viaduct and was not a party to the Board proceeding. Before this Court, Strohmeyer does not challenge or even address Member Schultz's analysis nor does he claim that she was in fact biased. And Strohmeyer's procedural argument that the Board erred in relying on Member Schultz's analysis is not only forfeited for not having been raised before the Board, but also ignores that the governing ethics regulations require members to assess their own impartiality and nowhere mandate the expansive adversarial process that he now claims was required. *Supplemental Standards of Ethical Conduct for Emps. of the ICC*, 9 I.C.C.2d 838, 840 (1993).

## ARGUMENT

### I. STROHMEYER MAY NOT SEEK JUDICIAL REVIEW OF THE BOARD'S DECISION.

There are two independent reasons this Court should dismiss Strohmeyer's review petition: he lacks Article III standing, and he lacks statutory standing because he is not a "party aggrieved" under the Hobbs Act.

#### A. Strohmeyer Lacks Article III Standing to Challenge the Board's Decision.

Strohmeyer has failed to demonstrate that the Board's decision that the property is no longer under the Board's jurisdiction caused him an injury-in-fact. Strohmeyer's newly professed interest in preservation of the Ninth Street Branch for future rail service is too general to establish Article III standing, and his new claim that he wants to acquire the Ninth Street Branch for trail use is far too attenuated.

Article III of the Constitution limits federal judicial power to "Cases" and "Controversies." U.S. Const. art. III, § 2. These standing requirements ensure that federal courts adjudicate only concrete disputes between genuinely adverse parties. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To establish Article III standing, a plaintiff must demonstrate, among other things, an injury-in-fact that is concrete and particularized, actual or imminent, not conjectural or hypothetical. *Id*. To be imminent, threatened injury must be "certainly impending." *Clapper v.*

*Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). This standard is not met where the claimed injury rests on a highly attenuated chain of possibilities. *Id*. at 410.

Strohmeyer's first allegation—that the *Decision* injured him by eliminating the "potential future rail use" on the property and "its continued inclusion within the national rail network," Strohmeyer Addendum in Support of Standing ("Standing Addendum") 3—is the type of generalized grievance that cannot support standing. An injury is not particularized when it affects a "general interest common to all members of the public." *Lujan*, 504 U.S. at 575. As Strohmeyer claims no connection to the property, no individual need for rail service, and no particular stake in whether the line might someday be reactivated, any general interest he may have as a policy matter in preserving the possibility of rail service is indistinguishable from that of any member of the public who might prefer that the property remain available for potential rail use. Such transportation policy preferences do not constitute particularized injury sufficient to support Article III standing. *Sierra Club v. Morton*, 405 U.S. 727, 738-39 (1972) (conservation organization's general concern about environmental protection was not particularized injury required for standing).

And Strohmeyer's second Article III standing claim—that the *Decision* injured him by precluding his ability to acquire the Ninth Street Branch under Section 8(d) of National Trails Systems Act (Trails Act), Standing Addendum 5;

Strohmeyer Br. 14—is far too attenuated. The Trails Act, which applies to rail lines within the Board's jurisdiction, permits States, political subdivisions, and private organizations to acquire unused rail rights-of-way for trail use, provided (among other things) that the rights-of-way are subject to reactivation or restoration for rail service. 16 U.S.C. § 1247(d). But the program is voluntary: the rail carrier owning the right-of-way must agree to the transfer. *Nat'l Wildlife Fed'n v. ICC*, 850 F.2d 694, 699-702 (D.C. Cir. 1988); *see also* 49 C.F.R. § 1152.29(c), (d). Transfer negotiations can take years and often involve payment of substantial consideration.[1] And the statute requires the trail sponsor to agree to assume "full responsibility" for "any legal liability" arising out the property's conveyance and use as a trail, and to pay "any and all taxes that may be levied or assessed against such rights-of-way." 16 U.S.C. § 1247(d).

These contingencies are fatal to Strohmeyer's Article III standing claim. There is no indication in the record before the agency or on appeal that Reading, if it were a rail carrier, would consider transferring the Ninth Street Branch to Strohmeyer, let alone that it and Strohmeyer would be able to agree on price and other terms. Nor is there any indication that Strohmeyer would or could assume

[1] *See*, *e.g.*, https://baynews9.com/fl/tampa/news/2026/07/15/booker-creek-trail-railroad (describing acquisition of .86-mile rail right-of-way in downtown St. Petersburg, Florida, under the Trails Act for $7 million).

"full responsibility" for the tax and other liability associated with ownership of a viaduct in the center of a major metropolitan area.[2] Vague "'some day' intentions," like Strohmeyer's newly professed interest in acquiring the property "at the appropriate time," Standing Addendum 3, "without any description of concrete plans, or indeed even any specification of when the [appropriate time] will be," are insufficient to establish standing as required under the Constitution. *Lujan*, 504 U.S. at 564. As Reading bluntly put it, Strohmeyer "never had any business being in this case."[3]

Strohmeyer's reliance on *City of Jersey City v. Consolidated Rail Corp.*, 668 F.3d 741 (D.C. Cir. 2012), is unavailing. Strohmeyer suggests that, under *City of Jersey City*, Article III standing is met whenever a plaintiff can show "the loss of a concrete statutory opportunity." Strohmeyer Br. 14-15. But there, Jersey City had Article III standing because, unlike Strohmeyer, it presented strong *evidence* that it

---

[2] Additionally, the Trails Act makes no provision for an individual to serve as a trail sponsor. 16 U.S.C. § 1247(d) (limiting trail sponsor eligibility to a "State, political subdivision, or qualified private organization"). Strohmeyer has not alleged that he would create a "private organization" to serve in that role.

[3] Reading Opp'n to Strohmeyer's Motion to File Br. Out of Time 2 (Apr. 20, 2026). After Respondents filed their merits brief responding to Reading's opening brief, Reading withdrew its opposition to Strohmeyer's late filing and led its reply brief with Strohmeyer's challenge to the agency's jurisdiction (a position Reading had not taken before), in "a conversion as sudden as the famous one on the Damascus road." *United States v. Thomas*, 97 F. 3d 1499, 1501 (D.C. Cir. 1996).

was going to invoke the regulatory relief at issue. *Id*. at 745 (noting that Jersey City passed an ordinance that "'*authorized and directed* [the city's Business Administrator] to undertake any actions and execute any documents necessary or appropriate to acquire the property either by purchase or condemnation'"). Here, Strohmeyer has not even alleged that he intends to satisfy the statutory prerequisites for acquiring the Ninth Street Branch for use as a trail, let alone that he will be able to negotiate a transfer from Reading.

### B. Strohmeyer Is Not a "Party Aggrieved" By the Board's Decision.

Strohmeyer's review petition should also be dismissed because he was not a party in the underlying Board proceeding and hence lacks statutory standing to challenge the *Decision* because he is not a "party aggrieved" under the Hobbs Act. 28 U.S.C. § 2344; *NRC v. Texas*, 605 U.S. 665, 674 (2025).

In *NRC v. Texas*, the Supreme Court looked to agency procedures to determine "how one becomes a party" to an agency adjudication. *NRC*, 605 U.S. at 688. Board regulations define a "party" before the Board as either a "petitioner," a "respondent," an "intervener," or "other persons permitted or directed by the Board to participate in a proceeding." 49 C.F.R. § 1101.2(d). Strohmeyer was neither a petitioner, respondent, nor an intervener, and the Board expressly rejected his efforts to participate on the ground that he failed to "demonstrate[] an interest that would warrant" it. *Decision* 5 (J.A. 276) (noting

that intervention is discretionary). His single filing before the Board in this proceeding was struck from the record. This was because nowhere in Strohmeyer's 35-page Motion to Dismiss did he indicate ***any*** interest whatsoever in the proceeding, including his newfound alleged interest in preserving rail service, trail use, or anything else.

Strohmeyer does not claim that the Board abused its discretion or otherwise erred in finding that he identified no interest sufficient to permit his participation as a party and striking his single filing. *See NRC*, 605 U.S. at 689 ("[I]f a person . . . believes that the Commission wrongly denied it intervention, then it may obtain judicial review of the intervention decision."). Rather, he claims that he became a party anyway because "the Board accepted [his] filings, addressed his arguments, and relied upon his submissions in its decision." Strohmeyer Br. 43. But the Board did *not* accept Strohmeyer's filing or rely on his submissions in its decision and, in fact, *struck* them from the record. *Decision* 5-6 (J.A. 276-77). Nor did the Board confer party status on Strohmeyer by responding to and rejecting his jurisdictional argument in its decision or by addressing his purported ethics concern via concurrence by the Board member whose ethics Strohmeyer wrongly impugned. For Strohmeyer to "qualify as a party, the [Board] must admit [him] as a party." *NRC*, 605 U.S. at 688; *see also Matson Navigation Co. v. DOT*, 77 F.4th 1151, 1158-59 (D.C. Cir. 2023) (holding that petitioner Matson was not "party"

aggrieved before administrative agency because, even though the agency "responded to and rejected several of Matson's comments on the merits," Matson's request for intervention was denied).[4] Strohmeyer was not allowed to participate as a party, and hence he has no statutory standing to challenge the *Decision* under the Hobbs Act.

## II. THE BOARD HAD JURISDICTION TO DECIDE THE CITY'S PETITION.

Strohmeyer's lack of Article III standing and party status are dispositive and require that his review petition be dismissed. But in any event, Strohmeyer's primary substantive argument—that only the United States District Court for the District of Columbia, as the successor to the Special Court,[5] may decide the issues raised in the City's petition—lacks merit.

The "original and exclusive" jurisdiction of the Special Court includes:

> any action . . . to interpret, alter, amend, modify, or implement any of the orders entered by such court pursuant to section 743(b) of this title in order to effect the purposes of this chapter or the goals of the final system plan.

---

[4] For this same reason, it does not matter that early in the proceeding Board staff identified Strohmeyer as a "party of record" for purposes of requiring that he be served copies of filings in the proceeding. Ultimately, the Board itself chose not to permit Strohmeyer to participate as a party, which is dispositive as to his lack of party status under the Hobbs Act.

[5] In the 1990s, Congress abolished the Special Court and transferred its powers to the United States District Court for the District of Columbia. 45 U.S.C. § 719(b)(2).

45 U.S.C. § 719(e)(2). But "not every claim relating to the [3R] Act is within [the Special Court's] exclusive jurisdiction. Rather . . . [the Special Court] has exclusive jurisdiction where resolution of the dispute involves the court's central functions": i.e., "the interpretation of conveyance orders, the [Final System Plan], the statutes creating the [Final System Plan], and conveyance documents." *Consol. Rail Corp. v. United States*, 883 F. Supp. 1565, 1571 (Reg'l Rail Reorg. Ct. 1995) ("*Conrail v. US*") (cleaned up). Accordingly, this Court has made clear that "[o]nly in [those] proceedings" where an "interpretation of the [Final System Plan] or the Special Court's conveyance order under 45 U.S.C. § 719(e)(2) is required does the Board lack jurisdiction to resolve the question of the nature of the trackage sought to be abandoned." *Conrail v. STB*, 571 F.3d at 20. In proceedings where "the Board's authority is not disputed based on the nature of the trackage," the Special Court's exclusive jurisdiction is not implicated. *Id.* Indeed, even Strohmeyer acknowledges that the Special Court's exclusive jurisdiction is over "disputes requiring interpretation" of "who received what, and on what terms." Strohmeyer Br. 12, 19-20.

Here, the record before the Board made clear that the parties did not dispute the existence or nature of the conveyance to Conrail or what was retained by Reading. In the City's petition and Reading's reply, the parties *agreed* that, pursuant to the Final System Plan, Reading Railroad conveyed a common carrier

obligation on the Viaduct to Conrail, as well as an easement over the Viaduct to provide rail service. Petition 2 (J.A. 4); Reply to Petition 1-2, 5 (J.A. 68-69, 72). They also *agreed* that Reading retained a fee ownership interest in the Viaduct. Petition 2 (J.A. 4); Reply to Petition 1, 6 (J.A. 68, 73). Finally, the City asserted that Reading retained no common carrier obligation to provide rail service over the Viaduct. *See, e.g.*, Petition 1 (J.A. 3) (alleging that Reading "possesses no authority to operate a rail line"); *id*. at 11 (J.A. 13) (stating that "Reading . . . lacks authority to operate a rail line"); *id*. at 2 (J.A. 4) (citing Reading's representations that the only assets it retained post-bankruptcy "were certain *non-rail properties [including the Viaduct]*") (emphasis added).

In reply, Reading did not dispute any of these assertions. Its argument was that it "retained ownership of the Viaduct" and that Conrail's abandonment of its operating rights "did not operate to abandon the entirety of the Viaduct property consisting of Reading's ownership interests as well." Reply to Petition 6, 11 (J.A. 73, 78). Thus, it was clear that the parties' dispute concerned whether the Board retained jurisdiction over Reading's real property interests in the Viaduct after Conrail abandoned its rail interests in 1984, not the nature of what Reading Railroad conveyed to Conrail in 1976 and what it retained for itself.

The parties' responses to Strohmeyer's Motion to Dismiss further confirmed the absence of any dispute between them over what was conveyed. The City

argued that the Board had jurisdiction to decide its petition because "[t]his proceeding presents no issue—at least none between the actual parties in interest here—as to the interpretation of the Final System Plan or what interests [Reading] or the Reading Company possessed at any given time." City Motion to Strike 2-3 (J.A. 247-48). The City noted that "[t]his proceeding presents no such question" about what was conveyed to whom. *Id*. at 4-5 (J.A. 249-50). The City stated that "Reading and the City have no disagreements concerning the factual background to this matter or the effect of the deed to Conrail," and listed numerous factual points on which they agreed. *Id*. at 5 (J.A. 250). And it explained that "Reading never suggests that it has any 'railroad interests,'" and that "Reading's clear argument is that 'property interests' or 'ownership interests' are sufficient to make Reading's participation in an abandonment proceeding necessary for the Board's jurisdiction over the Viaduct to terminate." *Id*. at 6 n.4 (J.A. 251).

Once again, *Reading disputed none of these statements*. *See* Reply to Motion to Strike 1-6 (J.A. 261-66).[6] In fact, Reading affirmatively acknowledged that it "is not a rail carrier." *Id.* at 2, 4 (J.A. 262, 264). By definition, not being a "rail carrier" means not having a common carrier obligation over the property at issue—further confirming the lack of any disagreement between the parties about

[6] As noted above, Reading did not contest the Board's jurisdiction to resolve the City's petition until its reply brief filed in this Court.

the non-rail nature of the rights Reading retained in the Viaduct. *See City of Austin, Tex.—Acquisition—S. Pac. Transp. Co.*, FD 30861(A), 1986 WL 1166762, at *1 (ICC served Nov. 4, 1986) (explaining that an entity "become[s] a rail carrier" when it assumes a "common carrier obligation"); *see also* Respondents' Joint Br. 19-21 (June 22, 2026) (citing additional cases). Like the City, Reading understood the proceeding as concerning "whether Conrail's abandonment of its operations served to remove the entirety of the Viaduct from the STB's jurisdiction—not whether 'Reading retained any rail interests, or whether Conrail acquired all of Reading's rail interests.'" Reading Opposition 9 (J.A. 196).

The question presented to the Board, therefore, was not what was conveyed to Conrail or retained by Reading. Rather, it was whether Reading's mere ownership interest in the Viaduct, unencumbered by any associated common carrier obligation, left that property within the Board's jurisdiction. That question did not require the Board to interpret the 3R Act, the Final System Plan, the Special Court's conveyance order, or any documents implementing that order. Accordingly, the Board had jurisdiction to address it.

Strohmeyer's argument that jurisdiction cannot depend on the parties' "subjective agreement," and that the Board "necessarily" resolved the "antecedent question of what property interests were retained by Reading under 45 U.S.C. § 744 and the Final System Plan" (Br. 28-29), is wrong. The Board can, and

routinely does, decide legal issues in declaratory order petitions based on undisputed facts. *See*, *e.g.*, *Joseph R. Fox—Petition for Declaratory Order*, FD 35161, 2009 WL 1383503, at *2 (STB served May 18, 2009), *aff'd sub nom. Fox v. STB*, 379 Fed. Appx. 767 (10th Cir. 2010). And as discussed above, this Court has made clear that the Special Court's exclusive jurisdiction to decide the "antecedent question" of the nature of the trackage conveyed is implicated only "*if [that question] arises*." *Conrail v. STB*, 571 F.3d at 20 (emphasis added). By contrast, cases where the "nature of the trackage" is not "contested," or where "resolution of the issue would not require interpretation of the [Final System Plan] or the Special Court's conveyance orders," do "not implicate the Special Court's . . . exclusive jurisdiction." *Id.* That logic controls here. Because the City and Reading did not dispute what interests each party held in the Viaduct following the conveyance—i.e., because the "antecedent question" did not arise—the Board had authority to decide whether the Viaduct remained within its jurisdiction.

Strohmeyer's remaining arguments all suffer from the same defective assumption that there was a dispute before the Board that was not in fact there. For example, Strohmeyer cites provisions in the 3R Act establishing special procedures governing the abandonment of rail properties retained by the bankrupt carriers in reorganization, Br. at 22, and notes that the Final System Plan provided for SEPTA to receive interests in the line, thus "precluding satisfaction of the statutory

conditions required for abandonment," *id*. at 23. But in the proceeding below, Reading (i.e., the successor to the bankrupt carrier in reorganization) did not argue that it retained any rail properties. Nor did any party ask the Board to address the nature of the interests retained by SEPTA or dispute the fact that SEPTA relinquished its rights in the Viaduct in 2010. *See Decision* 11 (J.A. 282).

*Conrail v. US*, also relied upon by Strohmeyer (Br. 31), similarly has no relevance here. In that case, which concerned allegations over Conrail's liability for certain environmental contamination costs, Conrail specifically asked the court "to interpret the [Final System plan], provisions of the [3R] Act and [the Northeast Rail Service Act], the [Special] Court's conveyance orders, and conveyance documents transferring ownership of rail properties designated by the [Final System plan]." 883 F. Supp. at 1571. None of that happened in the agency proceeding here. Because Reading and the City did not dispute what was conveyed to whom, they did not present the Board with competing interpretations of the Final System Plan, the Special Court's conveyance order, or the deed that conveyed the Ninth Street Branch to Conrail. And, indeed, the Board's decision reflects that it engaged in no such interpretation.

The Board had jurisdiction to decide the dispute before it.

## III. THE BOARD'S PROCESSES WERE SOUND.

The Board conducted the declaratory order proceeding fairly and in a manner consistent with its regulations and precedent. The City filed its petition for declaratory order containing all of its arguments for why the Ninth Street Branch no longer is within the Board's jurisdiction, and Reading filed its reply setting forth its rebuttal. Strohmeyer subsequently filed a 35-page motion to dismiss the City's petition, in which he presented the flawed jurisdiction arguments discussed above.

On appeal, Strohmeyer faults the Board for failing to institute a proceeding, publish notice in the *Federal Register*, establish a procedural schedule, and "define participation rights." Strohmeyer Br. 42-43. But no one—not the City, not Reading, and not Strohmeyer—asked the Board to do any of these things prior to ruling on the declaratory order petition. Instead, all three asked the Board to issue a ruling on the merits of their substantive arguments. *See* Petition 10-11 (J.A. 12-13); Reply to Petition 18-19 (J.A. 85-86); Motion to Dismiss 34-35 (J.A. 242-43). The Board did just that, as it has done in many other declaratory order proceedings. Strohmeyer has thus forfeited his argument for additional procedures. *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952).

Forfeiture aside, no statute or regulation required the Board to institute a proceeding or establish a procedural schedule for additional filings before issuing a

merits ruling. Strohmeyer contends that "[u]nder 5 U.S.C. § 554(c)" the Board had to "structure the proceeding so that submissions may be meaningfully presented, tested, and considered," Strohmeyer Br. 44-45, but that statute does not apply. Both § 554(c), as well as the formal adjudication requirements it incorporates by reference (§§ 556 and 557), attach only to "adjudication[s] required by statute to be determined on the record after opportunity for an agency hearing." 5 U.S.C. § 554(a); *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 655 (1990). There is no statute requiring that petitions for a declaratory order, like the one the City filed, be determined after a "hearing on the record." This Court has long held that in the absence of any such requirement, an agency "has substantial flexibility" to structure its proceedings, provided "it has sufficient information so that its final decision reflects a consideration of the relevant factors." *R.R. Comm'n of Tex. v. United States*, 765 F.2d 221, 228 (D.C. Cir. 1985) (quoting *Sea-Land Serv., Inc. v. United States*, 683 F.2d 491, 495-96 (D.C. Cir. 1982)). The Board had such information here.

The regulation Strohmeyer cites, 49 C.F.R. § 1011.7(a)(2)(vi), also "contemplates" none of the process that Strohmeyer says is required. It merely requires a decision on "whether to institute" a declaratory order proceeding, thus clearly contemplating the possibility that the agency might not do so because it

already has all the information it needs to grant or deny the request.[7] That the Board may adopt a "structured procedural schedule" in matters where it needs further information, or when parties request such a schedule at the outset of the proceeding, Strohmeyer Br. 45 (citing two such proceedings), does not mean it must do so in every case. Indeed, the Board routinely decides petitions for declaratory order based solely on the petition and replies without ever instituting a proceeding or setting a procedural schedule. *See*, *e.g.*, *Town of Smithtown—Petition for Declaratory Order*, FD 36575 (Sub-No. 1), 2024 WL 757039, at *3 n.6 (STB served Feb 23, 2024); *Louisville & Jefferson Cnty. Riverport Auth.—Petition for Declaratory Order*, FD 36463, 2021 WL 4940260, at *2-3 (STB served Oct. 22, 2021); *Alleghany Valley R.R.—Petition for Declaratory Order—William Fiore*, FD 35388, 2011 WL 1546589, at *1 & *4 n.5 (STB served Apr. 25, 2011). The process here was sufficient.

Strohmeyer's argument that the Board's decision to deny the City's motion for leave to file a sur-reply to its petition for declaratory order contradicted the Board's "frequent" practice of allowing such submissions ignores the Board's

---

[7] Strohmeyer notes (Br. 43) that the Board's regulation formerly delegated to the Board's Director of the Office of Proceedings the decision whether to institute a proceeding. *See* 49 C.F.R. § 1011.7 (2025); *see also* 49 C.F.R. § 1011.7 (2026) (now delegating that function to the Board's newly created Chief Counsel). To the extent Strohmeyer suggests that the Board erred by making that decision itself, the Board's regulations also provide that "[t]he Board may bring before it any matter assigned to an . . . employee." 49 C.F.R. § 1011.2(b).

announcement, months before, that it would more strictly enforce its existing rule against sur-replies. *Decision* 5 (J.A. 275) (citing *Sunflower State Indus. Ry.—Petition for Declaratory Order*, FD 36714 (Sub-No. 1), 2025 WL 945785, at *1 n.3 (STB served Mar. 28, 2025)). An agency may change policy so long as it acknowledges the change and provides a "reasoned explanation" for its departure. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). In *Sunflower*, the Board acknowledged that it had often accepted replies to replies in the past but explained that such filings are prohibited under its regulation at 49 C.F.R. § 1104.13(c), that information provided in such replies often can be included in an initial filing, and that the "benefits from the orderly and efficient administration of cases, including reducing burden on the public and agency, justify enforcing this rule more strictly" going forward. 2025 WL 945785, at *1 n.3. And the Board has applied the prohibition on replies to replies more strictly since then.[8] Its decision to strike the City's sur-reply was reasonable and reasonably explained.[9]

---

[8] *E.g.*, *Norfolk S. Corp.—Acquisition of Control—Norfolk & Portsmouth Belt Line R.R.*, FD 36836, 2026 WL 1147628, at *20 n.18 (STB served Apr. 6, 2026); *Kan. & Okla. R.R.—Lease & Operation Exemption with Interchange Commitment—Union Pac. R.R.*, FD 36849, 2026 WL 795881, at *7 & n.10 (STB served Mar. 20, 2026); *Great Walton R.R.—Petition for Declaratory Order*, AB 1242 (Sub-No. 1), 2026 WL 562267, at *5 n.6 (STB served Feb. 27, 2026).

[9] Nor was there any reason for the Board to deviate from its prohibition on sur-replies to consider the deed that the City attached to its sur-reply and which reflected Conrail's former easement. As the Board explained, "the City [did] not 'contest the meaning of the deed' and 'accept[ed] Reading's characterization of its [retained] interest.'" *Decision* 6 (J.A. 277) (quoting City Motion to Strike 12 (J.A.

Strohmeyer's contention that the Board "refused to classify" the City's response to his Motion to Dismiss, purportedly "depriv[ing] Strohmeyer of the ability to determine" whether he had the right to respond, Strohmeyer Br. 49-50, is meritless. The City moved to strike Strohmeyer's pleading on the ground that Strohmeyer provided no "explanation of a valid interest that would justify his participation." City Motion to Strike 2 (J.A. 247); *see also id*. at 3-4 (J.A. 248-49). "Alternatively," in the event the Board permitted Strohmeyer's participation, the City requested that the Board deny Strohmeyer's Motion to Dismiss on the ground that the Board had jurisdiction to resolve the City's declaratory order petition. *Id.* at 2, 4-13 (J.A. 247, 249-58). Accordingly, there was no uncertainty as to the nature of the City's filing: it moved to strike and, in case that motion were to be denied, offered a reply to the merits. As Strohmeyer concedes (Br. 49-50), the Board's regulations permit replies to motions. 49 C.F.R. § 1104.13(a). Indeed, Reading understood that it was entitled to respond to the City's motion and did just that. Reading Reply to Motion to Strike (J.A. 261).

To the extent Strohmeyer complains that the Board deprived him of due process, Strohmeyer Br. 52-53, 61-64, he has not identified—and cannot identify—any liberty or property interest on his part that is protected by the Due

257)). The deed was therefore not "critical documentary evidence" as Strohmeyer contends. Strohmeyer Br. 42, 48.

Process Clause of the Constitution. Before any procedural protections attach, a claimant must first establish that a constitutionally protected property or liberty interest is at stake. *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972). Strohmeyer's wish that the Ninth Street Branch be preserved for future rail service is neither a liberty nor a property interest, and his newly professed, highly contingent aspiration to potentially acquire the Ninth Street Branch under the Trails Act (*see supra* pp. 10 to 13) is not a "legitimate claim of entitlement," *id*. at 577, to property entitled to Constitutional protection. Strohmeyer's asserted interest in acquiring the Ninth Street Branch under the Trails Act is, at most, a "unilateral expectation"—precisely the sort of interest *Roth* held insufficient to trigger due process protection. *Id.* Because Strohmeyer has alleged no deprivation of a cognizable "property interest or liberty interest" in the Ninth Street Branch, he had no entitlement to due process protections in the proceeding below. *Langeman v. Garland*, 88 F.4th 289, 297-98 (D.C. Cir. 2023).

Strohmeyer also fails to show that he was harmed by the procedures used by the Board. Due process requires notice and a meaningful opportunity to be heard. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). Here, Strohmeyer learned of the proceeding from the Board's public docket, which is available online. Standing Addendum 4. He then filed a 35-page motion to dismiss the City's petition, raising the same jurisdictional arguments he makes on

appeal. He does not explain what other facts or arguments he would have presented to the Board had the Board done any of the things he claims it should have done, such as initiating a proceeding or setting a procedural schedule. *See In re Bartle*, 560 F.3d 724, 730 (7th Cir. 2009) (rejecting due process argument where appellant failed to indicate "what argument or evidence he would have presented" had there been greater process). Strohmeyer had a meaningful opportunity to be heard.

## IV. THE BOARD DETERMINATION WAS IMPARTIAL.

In his Motion to Dismiss, Strohmeyer raised what he described as "a genuine concern regarding a potentially serious conflict of interest" (J.A. 224) on the part of Member Schultz based on her prior employment with nonparty SEPTA, which, he noted, had once had property rights in the Viaduct. Strohmeyer stated that he was "neutral regarding the decision by member Shultz to either recuse herself or not." Motion to Dismiss 22-23 (J.A. 230-31). All he wanted, he said, was for the Board to "address the issue in a fully transparent and open manner." *Id*. at 21 (J.A. 229) (footnote omitted).

Strohmeyer received the "transparent and open" discussion that he requested. In consultation with the Board's Designated Agency Ethics Official, Member Schultz issued a detailed concurrence in which she considered Strohmeyer's "concerns" under the applicable ethics regulations and explained that

a reasonable person with knowledge of the relevant facts would not be likely to question her impartiality in the Board proceeding and that her participation was proper. *Decision* 14-15 (J.A. 285-86) (citing 5 C.F.R. part 2635, subpart E—Impartiality in Performing Official Duties). As she rightly concluded, "[t]he Board's decision in this matter—and my participation—do not affect whatever interests SEPTA relinquished fifteen years ago." *Id*. at 15 (J.A. 286).

Strohmeyer makes no effort to engage with Member Schultz's analysis, show why the conclusion she drew was wrong, or explain how her prior employment with SEPTA could have any effect on her participation in the underlying agency proceeding where SEPTA has no interest in the Viaduct. Strohmeyer Br. 62 ("Here, the issue is not whether the decisionmaker was in fact biased."). Rather, his complaint is purely procedural: that the Board erred in "address[ing] the issue only in a concurring opinion authored by the decisionmaker whose impartiality had been questioned" and that the Board should have evaluated his concerns based on an "adversarial presentation" and a more "develop[ed]" record. Strohmeyer Br. 57-58, 62 ("The issue is whether the process used to evaluate potential bias was adequate."). But Strohmeyer's pleading before the Board demonstrates that he understood that Member Schultz would be making the decision "to either recuse herself or not," Motion to Dismiss 22-23 (J.A. 230-31), a process to which he raised no objection. Nor did he (or the City or Reading) ask

for either an adversarial presentation on the ethics issue or the opportunity to further develop the record. Accordingly, Strohmeyer's objections to how the ethics issue was handled are forfeited and not properly before this court. *L.A. Tucker Truck Lines*, 344 U.S. at 37.

In any event, Strohmeyer's objections have no merit. The applicable ethics regulations provide for the resolution of impartiality concerns using the very "internal consultation and self-assessment" (Br. 62) that he disparages. Under 5 C.F.R. § 2635.502(e), it is the "employee or the agency designee" who is to consider whether that individual should participate in an agency proceeding where a question has been raised "about the employee's impartiality." 5 C.F.R. § 2635.502(e). And while those regulations give the agency designee (at the Board, the Designated Agency Ethics Official) ultimate authority to require recusal, *see* 5 C.F.R. § 2635.502(c), the agency long ago determined that, with respect to Board Members, "it would be inappropriate for any person other than [a Board Member] to determine whether or not he or she should be disqualified from performing any of [his or her] functions on impartiality grounds." *See Supplemental Standards of Ethical Conduct for Emps. of the ICC*, 9 I.C.C.2d 838, 840 (1993).[10]

[10] The agency likened the role of a Board member in an agency adjudication to that of a judge, and noted that judges traditionally act upon motions to recuse themselves from their assigned cases. *Id.* And, like judges, "in the absence of a

Accordingly, the Board's supplemental ethics regulations make clear that a "member is an 'agency designee' for the purpose of [such] an impartiality disqualification determination," provided this determination "be made in consultation with the Designated Agency Ethics Official." 5 C.F.R. § 5001.103; *see also CSX Corp.—Control & Operating Leases/Agreements—Conrail Inc.*, FD 33388, 1997 WL 575371, at *2 (STB served Sept. 18, 1997) ("It is up to each Board member to assess his or her own impartiality."). Strohmeyer does not even attempt to reconcile his position with these provisions and precedent.

Moreover, nowhere does the required Board process contemplate any sort of "adversarial presentation" or opportunity for record development. *See* 5 C.F.R. § 2635.502(d); 5 C.F.R. § 5001.103. And Board members in past proceedings have assessed impartiality without such procedures. *See*, *e.g.*, *Cal. High-Speed Rail Auth.—Constr. Exemption—in Fresno, Kings, Tulare, & Kern Cntys., Cal.*, FD 35724 (Sub-No. 1), 2014 WL 3973120, at *16-17 (STB served Aug. 12, 2014); *CSX Corp.*, 1997 WL 575371, at *1-3. Nor would any further process have made a difference in this case given that the facts Member Schultz relied upon in her

---

legitimate reason to recuse [herself], a [member] should participate in cases assigned." *United States v. Holland*, 519 F.3d 909, 912 (9th Cir. 2008) (internal quotation marks omitted). Otherwise, a Board member could abdicate her Constitutional and statutory obligations "for any reason or no reason at all," *id.*—or, as here, based merely on a third-party "concern" about an irrelevant past association.

concurrence are both uncontested and dispositive: that SEPTA was not a party, that Member Schultz's employment with SEPTA had ended more than 4 years previously, and that SEPTA relinquished its ownership in the line some 15 years earlier. Indeed, for all of Strohmeyer's lengthy briefing on this topic, *see* Strohmeyer Br. 55-65, he offers no explanation as to why Member Schultz's prior employment at SEPTA would create a conflict of interest *now*. The Board's handling of Strohmeyer's purported ethics concern was appropriate.

Finally, ethics determinations by individual Board members are not directly reviewable. *See Fast Food Workers Comm. v. NLRB*, 31 F.4th 807, 815-16 (D.C. Cir. 2022). Although an agency decision can be reversed if one of the decisionmakers was biased, *e.g.*, *Cinderella Career & Finishing Schools, Inc. v. FTC*, 425 F.2d 583 (D.C. Cir. 1970), here Strohmeyer does not allege actual bias. Strohmeyer Br. 62 ("Here, the issue is not whether the decisionmaker was in fact biased. The issue is whether the process used to evaluate potential bias was adequate."). In the absence of any claimed (much less proven) bias on the part of any Board member, Strohmeyer has established no basis for disturbing the Board's decision.

## CONCLUSION

For the foregoing reasons, the petition for review in No. 25-1268 should be dismissed or, in the alternative, denied.

Respectfully submitted,

ROBERT B. NICHOLSON
AVI GRUNFELD
Attorneys
Antitrust Division
U. S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20503

ANIKA S. COOPER
Chief Counsel

SCOTT M. ZIMMERMAN
Acting Deputy Chief Counsel

ADAM M. KRESS
Associate Counsel - Litigation

/s/ *Erik G. Light*
ERIK G. LIGHT
Attorney
Surface Transportation Board
Washington, DC 20423-0001
(202) 919-8988
erik.light@stb.gov

September 3, 2026

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of the Court's order of July 7, 2026, because the brief contains 7,700 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft 365 version of Microsoft Word in 14-point Times New Roman font.

/s/ *Erik G. Light*
Erik G. Light
Attorney
Office of the Chief Counsel
Surface Transportation Board

Dated: September 3, 2026

## CERTIFICATE OF SERVICE

I, Erik G. Light, hereby certify that on September 3, 2026, I electronically filed the foregoing **Respondents' Joint Brief in Response to Petitioner Strohmeyer's Brief** with the Clerk of the Court using the CM/ECF system, which caused counsel to be served electronically through CM/ECF, and I further certify that a copy of such document was served by first class mail and email on:

Eric A. Strohmeyer
P.O. Box 4232
Warren, NJ 07059
estrohmeyer@cnjrail.com

/s/ *Erik G. Light*
Erik G. Light

Dated: September 3, 2026

# ADDENDUM

## TABLE OF CONTENTS

**PAGE**

**United States Constitution**

U.S. Const. art III, § 2 ........................................ADD-1

**United States Code**

5 U.S.C. § 554 ........................................ADD-2

16 U.S.C. § 1247(d) ........................................ADD-5

**Code of Federal Regulations**

5 C.F.R. § 2635.502 ........................................ADD-6

5 C.F.R. § 5001.103 ........................................ADD-14

49 C.F.R. § 1011.7 (2025) ........................................ADD-15

49 C.F.R. § 1011.7 (2026) ........................................ADD-17

49 C.F.R. § 1101.2 ........................................ADD-23

49 C.F.R. § 1104.13 ........................................ADD-25

49 C.F.R. § 1152.29 ........................................ADD-27

United States Code Annotated
Constitution of the United States
Annotated
Article III. The Judiciary

U.S.C.A. Const. Art. III § 2, cl. 1

# Section 2, Clause 1. Jurisdiction of Courts [Text & Notes of Decisions subdivisions I to VII]

Currentness

<Notes of Decisions for Constitution Art. III, § 2, cl. 1, Jurisdiction of Courts, are displayed in multiple documents.>

**Section 2.** The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;--to all Cases affecting Ambassadors, other public Ministers and Consuls;--to all Cases of admiralty and maritime Jurisdiction;--to Controversies to which the United States shall be a Party;--to Controversies between two or more States;--between a State and Citizens of another State;--between Citizens of different States;--between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

## AUTHORITY TO REGULATE ABORTION

<For Dobbs v. Jackson Women's Health Org., No. 19-1392, see 597 U.S. 215, 142 S.Ct. 2228, 213 L.Ed.2d 545 (U.S. June 24, 2022).>

## U.S. SUPREME COURT OCTOBER TERM 2025

<U.S. Supreme Court, Oct. Term 2025, Oral Argument - Question Presented:
>

<Whether Petitioners, as federal candidates, have pleaded sufficient factual allegations to show Article III standing to challenge state time, place, and

United States Code Annotated
Title 5. Government Organization and Employees (Refs & Annos)
Part I. The Agencies Generally
Chapter 5. Administrative Procedure (Refs & Annos)
Subchapter II. Administrative Procedure (Refs & Annos)

5 U.S.C.A. § 554

§ 554. Adjudications

Currentness

**(a)** This section applies, according to the provisions thereof, in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing, except to the extent that there is involved--

**(1)** a matter subject to a subsequent trial of the law and the facts de novo in a court;

**(2)** the selection or tenure of an employee, except a [1] administrative law judge appointed under section 3105 of this title;

**(3)** proceedings in which decisions rest solely on inspections, tests, or elections;

**(4)** the conduct of military or foreign affairs functions;

**(5)** cases in which an agency is acting as an agent for a court; or

**(6)** the certification of worker representatives.

**(b)** Persons entitled to notice of an agency hearing shall be timely informed of--

**(1)** the time, place, and nature of the hearing;

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(2)** the legal authority and jurisdiction under which the hearing is to be held; and

**(3)** the matters of fact and law asserted.

When private persons are the moving parties, other parties to the proceeding shall give prompt notice of issues controverted in fact or law; and in other instances agencies may by rule require responsive pleading. In fixing the time and place for hearings, due regard shall be had for the convenience and necessity of the parties or their representatives.

**(c)** The agency shall give all interested parties opportunity for--

**(1)** the submission and consideration of facts, arguments, offers of settlement, or proposals of adjustment when time, the nature of the proceeding, and the public interest permit; and

**(2)** to the extent that the parties are unable so to determine a controversy by consent, hearing and decision on notice and in accordance with sections 556 and 557 of this title.

**(d)** The employee who presides at the reception of evidence pursuant to section 556 of this title shall make the recommended decision or initial decision required by section 557 of this title, unless he becomes unavailable to the agency. Except to the extent required for the disposition of ex parte matters as authorized by law, such an employee may not--

**(1)** consult a person or party on a fact in issue, unless on notice and opportunity for all parties to participate; or

**(2)** be responsible to or subject to the supervision or direction of an employee or agent engaged in the performance of investigative or prosecuting functions for an agency.

An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

557 of this title, except as witness or counsel in public proceedings. This subsection does not apply--

**(A)** in determining applications for initial licenses;

**(B)** to proceedings involving the validity or application of rates, facilities, or practices of public utilities or carriers; or

**(C)** to the agency or a member or members of the body comprising the agency.

**(e)** The agency, with like effect as in the case of other orders, and in its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty.

CREDIT(S)

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 384; Pub.L. 95-251, § 2(a)(1), Mar. 27, 1978, 92 Stat. 183.)

## Footnotes

1 So in original.

5 U.S.C.A. § 554, 5 USCA § 554
Current through P.L. 119-102. Some statute sections may be more current, see credits for details.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Housing Act of 1954, to encourage the planning of recreation trails in connection with the recreation and transportation planning for metropolitan and other urban areas. He is further directed, in administering the urban open-space program under title VII of the Housing Act of 1961, to encourage such recreation trails.

**(c) Secretary of Agriculture to encourage States, local agencies, and private interests**

The Secretary of Agriculture is directed, in accordance with authority vested in him, to encourage States and local agencies and private interests to establish such trails.

**(d) Interim use of railroad rights-of-way**

The Secretary of Transportation, the Chairman of the Surface Transportation Board, and the Secretary of the Interior, in administering the Railroad Revitalization and Regulatory Reform Act of 1976 (45 U.S.C. 801 et seq.) and chapter 224 of Title 49, shall encourage State and local agencies and private interests to establish appropriate trails using the provisions of such programs. Consistent with the purposes of that Act, and in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes. If a State, political subdivision, or qualified private organization is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way, then the Board shall impose such terms and conditions as a requirement of any transfer or conveyance for interim use in a manner consistent with this chapter, and shall not permit abandonment or discontinuance inconsistent or disruptive of such use.

**(e) Designation and marking of trails; approval of Secretary of the Interior**

Such trails may be designated and suitably marked as parts of the nationwide system of trails by the States, their political subdivisions, or other appropriate administering agencies with the approval of the Secretary of the Interior.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Code of Federal Regulations
Title 5. Administrative Personnel
Chapter XVI. Office of Government Ethics
Subchapter B. Government Ethics
Part 2635. Standards of Ethical Conduct for Employees of the Executive Branch (Refs & Annos)
Subpart E. Impartiality in Performing Official Duties (Refs & Annos)

5 C.F.R. § 2635.502

§ 2635.502 Personal and business relationships.

Effective: August 15, 2024
Currentness

(a) Consideration of appearances by the employee. In considering whether any of the following would cause a reasonable person to question their impartiality, employees may seek the assistance of their supervisor, an agency ethics official, or the agency designee.

(1) When an employee knows that a particular matter involving specific parties is likely to have a direct and predictable effect on the financial interest of a member of the employee's household, and the employee determines that the circumstances would cause a reasonable person with knowledge of the relevant facts to question the employee's impartiality in the matter, the employee should not participate in the matter unless the employee has received a determination from the agency designee regarding the appearance problem in accordance with paragraph (c) of this section or received an authorization from the agency designee in accordance with paragraph (d) of this section.

(2) When an employee knows that a person with whom the employee has a covered relationship is or represents a party to a particular matter involving specific parties, and the employee determines that the circumstances would cause a reasonable person with knowledge of the relevant facts to question their impartiality in the matter, the employee should not participate in the matter unless the employee has received a determination from the agency designee regarding the appearance problem in accordance with paragraph (c) of this section or received

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

an authorization from the agency designee in accordance with paragraph (d) of this section.

(3) Employees who are concerned that circumstances other than those specifically described in paragraphs (a)(1) and (2) of this section would raise a question regarding their impartiality should use the process described in this section to determine whether they should not participate in a particular matter.

(b) Definitions. For purposes of this section:

(1) An employee has a covered relationship with:

(i) A person, other than a prospective employer described in § 2635.603(c), with whom the employee has or seeks a business, contractual, or other financial relationship that involves other than a routine consumer transaction;

Note 1 to paragraph (b)(1)(i): An employee who is seeking employment within the meaning of § 2635.603 must comply with subpart F of this part rather than with this section.

(ii) A person who is a member of the employee's household, or who is a relative with whom the employee has a close personal relationship;

(iii) A person for whom the employee's spouse, parent, or child is, to the employee's knowledge, serving or seeking to serve as an officer, director, trustee, general partner, agent, attorney, consultant, contractor, or employee;

(iv) Any person for whom the employee has, within the last year, served as officer, director, trustee, general partner, agent, attorney, consultant, contractor, or employee; or

(v) An organization, other than a political party described in 26 U.S.C. 527(e), in which the employee is an active participant. Participation is active if, for example, it involves service as an official of the organization or in a capacity similar to that

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

of a committee or subcommittee chairperson or spokesperson, or participation in directing the activities of the organization. In other cases, significant time devoted to promoting specific programs of the organization, including coordination of fundraising efforts, is an indication of active participation. Payment of dues or the donation or solicitation of financial support does not, in itself, constitute active participation.

(2) Direct and predictable effect has the meaning set forth in § 2635.402(b)(1).

(3) Particular matter involving specific parties has the meaning set forth in § 2640.102(l) of this chapter.

Example 1 to paragraph (b): An employee of the General Services Administration (GSA) has made an offer to purchase a restaurant owned by a local developer. The developer has submitted an offer in response to a GSA solicitation for the lease of office space. Under the circumstances, the GSA employee would be correct in concluding that a reasonable person would be likely to question their impartiality if they were to participate in evaluating that developer's or its competitor's lease proposal.

Example 2 to paragraph (b): An employee of the Department of Labor is providing technical assistance in drafting occupational safety and health legislation that will affect all employers of five or more persons. The employee's spouse is employed as an administrative assistant by a large corporation that will incur additional costs if the proposed legislation is enacted. Because the legislation is not a particular matter involving specific parties, the employee may continue to work on the legislation and need not be concerned that the spouse's employment with an affected corporation would raise a question concerning the employee's impartiality.

Example 3 paragraph (b): An employee of the Bureau of Land Management (BLM) is studying environmental problems created by the use of hazardous substances on a particular section of public land. BLM has a contract with an environmental services company to produce a water quality study of the groundwater under this section of land along with a recommendation about how to remediate any problems that are found. The BLM employee will use the study to help determine the extent of the damage and to recommend a solution to any problems that are revealed. The employee's parent has accepted a job with this environmental services company and will be signing and submitting the report of the company's findings. Under these circumstances, the employee would be correct in concluding that a reasonable person would be likely to

question their impartiality if they were to continue participating in the study related to this parcel of public land.

Example 4 to paragraph (b): An engineer has just resigned from a position as vice president of an electronics company in order to accept employment with the Federal Aviation Administration (FAA) in a position involving procurement responsibilities. Although the employee did not receive a covered payment in connection with the resignation and has severed all financial ties with the firm, under the circumstances the employee would be correct in concluding that this former service as an officer of the company would be likely to cause a reasonable person to question their impartiality if they were to participate in the administration of an FAA contract for which the firm is a first-tier subcontractor.

Example 5 to paragraph (b): An employee of the Internal Revenue Service (IRS) is a member of a private organization whose purpose is to restore a Victorian-era railroad station, and chairs its annual fundraising drive. Under the circumstances, the employee would be correct in concluding that this active membership in the organization would be likely to cause a reasonable person to question their impartiality if they were to participate in an IRS determination regarding the tax-exempt status of the organization.

Example 6 to paragraph (b): An employee of the Department of Defense (DoD) has responsibility for testing avionics produced by a large Air Force contractor. The employee just learned that their adult child accepted a staff position in the human resources division of that contractor. Although the DoD employee has a covered relationship with the contractor that employs their child, the employee could justifiably conclude that a reasonable person would not be likely to question their impartiality because the child's work is unrelated to the avionics contract.

Example 7 to paragraph (b): An employee of the Department of Defense (DoD) leads the office that is testing a new type of jet engine produced by a multinational conglomerate's aviation division. The employee's lifelong best friend is the head of the conglomerate's aviation division and is responsible for presenting and promoting the new jet engine. Although the DoD employee does not have a covered relationship under paragraph (b)(1) of this section, the employee is concerned that, under paragraph (a)(3) of this section, questions regarding their impartiality could be raised. Here, the employee could justifiably conclude that a reasonable person would be likely to question their impartiality if they were to continue performing duties related to this jet engine.

(c) Determination by agency designee.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(1) When the agency designee has information concerning a potential appearance problem arising from either the financial interest of a member of the employee's household in a particular matter involving specific parties or a particular matter involving specific parties in which a person with whom the employee has a covered relationship is a party or represents a party, the agency designee may make an independent determination as to whether a reasonable person with knowledge of the relevant facts would be likely to question the employee's impartiality in the matter. Ordinarily, the agency designee's determination will be initiated by information provided by the employee pursuant to paragraph (a) of this section. However, at any time, including after an employee has recused from participating in a particular matter pursuant to paragraph (e) of this section, agency designees may make this determination on their own initiative or when requested by the employee's supervisor or any other person responsible for the employee's assignment.

(2) If the agency designee determines that the employee's impartiality is likely to be questioned, the agency designee must then determine, in accordance with paragraph (d) of this section, whether the employee should be authorized to participate in the matter. If the agency designee determines that the employee's participation should not be authorized, the employee must recuse from participating in the particular matter in accordance with paragraph (e) of this section.

(3) If the agency designee determines that the employee's impartiality is not likely to be questioned, the agency designee may advise the employee, including an employee who has reached a contrary conclusion under paragraph (a) of this section, that the employee's participation in the matter would be proper.

(d) Authorization by agency designee. When an employee's participation in a particular matter involving specific parties would not violate 18 U.S.C. 208(a), but would raise a question in the mind of a reasonable person about the employee's impartiality, the agency designee may authorize the employee to participate in the matter based on a determination, made in light of all relevant circumstances, that the interest of the Government in the employee's participation outweighs the concern that a reasonable person may question the integrity of the agency's programs and operations.

(1) Factors which may be taken into consideration include:

(i) The nature of the relationship involved;

(ii) The effect that resolution of the matter would have upon the financial interests of the person involved in the relationship;

(iii) The nature and importance of the employee's role in the matter, including the extent to which the employee is called upon to exercise discretion in the matter;

(iv) The sensitivity of the matter;

(v) The difficulty of reassigning the matter to another employee; and

(vi) Adjustments that may be made in the employee's duties that would reduce or eliminate the likelihood that a reasonable person would question the employee's impartiality.

(2) Authorization by the agency designee will be documented in writing at the agency designee's discretion or when requested by the employee. An employee who has been authorized to participate in a particular matter involving specific parties may not thereafter recuse from participating in the matter on the basis of an appearance problem involving the same circumstances that have been considered by the agency designee.

Example 1 to paragraph (d): The Deputy Director of Personnel for the Department of the Treasury and an attorney with the Department's Office of General Counsel are general partners in a real estate partnership. The Deputy Director advises their supervisor, the Director of Personnel, of the relationship upon being assigned to a selection panel for a position for which the partner has applied. If selected, the partner would receive a substantial increase in salary. The agency designee cannot authorize the Deputy Director to participate on the panel under the authority of this section because the Deputy Director is prohibited by criminal statute, 18 U.S.C. 208(a), from participating in a particular

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

matter affecting the financial interest of a person who is their general partner. See § 2635.402.

Example 2 paragraph (d): A new employee of the Securities and Exchange Commission is assigned to an investigation of insider trading by the brokerage house where they have recently been employed. Because of the sensitivity of the investigation, the agency designee may be unable to conclude that the Government's interest in the employee's participation in the investigation outweighs the concern that a reasonable person may question the integrity of the investigation, even though the employee has severed all financial ties with the company. Based on consideration of all relevant circumstances, the agency designee might determine, however, that it is in the interest of the Government for the employee to participate in the review of a routine filing by the particular brokerage house.

Example 3 paragraph (d): An Internal Revenue Service employee involved in a long and complex tax audit learns that their child has just accepted an entry-level management position with a corporation whose taxes are the subject of the audit. Because the audit is essentially complete and because the employee is the only one with an intimate knowledge of the case, the agency designee might determine, after considering all relevant circumstances, that it is in the Government's interest for the employee to complete the audit, which is subject to additional levels of review.

(e) Recusal. Unless the employee is authorized to participate in the matter under paragraph (d) of this section, an employee may not participate in a particular matter involving specific parties when the employee or the agency designee has concluded, in accordance with paragraph (a) or (c) of this section, that the financial interest of a member of the employee's household, or the role of a person with whom the employee has a covered relationship, is likely to raise a question in the mind of a reasonable person about the employee's impartiality. Recusal is accomplished by not participating in the matter. When the covered relationship is with a former employer, this recusal requirement is for a period of one year after the date of the employee's resignation from the position with the former employer.

(1) Notification. Employees who become aware of the need to recuse from participating in a particular matter involving specific parties to which they have been assigned must take whatever steps are necessary to ensure that they do not participate in the matter. Appropriate oral or written notification of their recusal may be made to an agency ethics official, coworkers, or a supervisor to document and help effectuate the recusal.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(2) Documentation. Employees need not file written recusal statements unless they are required by part 2634 of this chapter to file written evidence of compliance with an ethics agreement with the Office of Government Ethics or a designated agency ethics official, or are specifically directed by an agency ethics official or the person responsible for their assignments to file written recusal statements. However, it is often prudent for employees to create a record of their actions by providing written notice to an agency ethics official, a supervisor, or other appropriate official.

(f) Irrelevant considerations. An employee's reputation for honesty and integrity is not a relevant consideration for purposes of any determination required by this section.

Note 2 to § 2635.502: Nothing in this section should be construed to suggest that employees should not participate in a matter because of their political, religious, or moral views.

SOURCE: 57 FR 35041, Aug. 7, 1992; 62 FR 48747, Sept. 17, 1997; 88 FR 33809, May 25, 2023; 89 FR 43695, May 17, 2024, unless otherwise noted.

AUTHORITY: 5 U.S.C. 7301, 7351, 7353; 5 U.S.C. ch. 131; E.O. 12674, 54 FR 15159, 3 CFR, 1989 Comp., p. 215, as modified by E.O. 12731, 55 FR 42547, 3 CFR, 1990 Comp., p. 306.

Notes of Decisions (16)

Current through July 20, 2026, 91 FR 45513. Some sections may be more current. See credits for details.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 5. Administrative Personnel
Chapter XL. Interstate Commerce Commission (Refs & Annos)
Part 5001. Supplemental Standards of Ethical Conduct for Employees of the Interstate Commerce Commission (Refs & Annos)

5 C.F.R. § 5001.103

# § 5001.103 Impartiality determinations for members of the Interstate Commerce Commission.

Currentness

A member is an “agency designee” for the purposes of making an impartiality disqualification determination under 5 CFR 2635.502(d) with respect to the member's own participation in a Commission proceeding. This determination must be made in consultation with the Designated Agency Ethics Official.

SOURCE: 58 FR 41990, Aug. 6, 1993; 89 FR 104859, Dec. 26, 2024; 90 FR 9507, Feb. 13, 2025, unless otherwise noted.

AUTHORITY: 5 U.S.C. 7301; 5 U.S.C. App. (Ethics in Government Act of 1978); 49 U.S.C. 10301, 10306, 10321; E.O. 12674, 54 FR 15159; 3 CFR, 1989 Comp. at 215, as modified by E.O. 12731, 55 FR 42547; 3 CFR, 1990 Comp., at 306; 5 CFR 2635.105, 2635.403, 2635.803.

Current through July 20, 2026, 91 FR 45513. Some sections may be more current. See credits for details.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO



issues is delegated to administrative law judges, as described in § 1111.12(d) of this chapter.

[67 FR 60167, Sept. 25, 2002, as amended at 74 FR 52904, Oct. 15, 2009; 81 FR 8851, Feb. 23, 2016; 83 FR 17299, Apr. 19, 2018; 85 FR 47696, Aug. 6, 2020]

**§ 1011.7 Delegations of authority by the Board to specific offices of the Board.**

(a) *Office of Proceedings*. (1) The Director of the Office of Proceedings is delegated the authority to determine (in consultation with involved Offices) whether to waive filing fees set forth at 49 CFR 1002.2(f).

(2) In addition to the authority delegated at 49 CFR 1011.6(c)(3), (d), (g), and (h), the Director of the Office of Proceedings shall have authority initially to determine the following:

(i) Whether to designate abandonment proceedings for oral hearings on request.

(ii) Whether offers of financial assistance satisfy the statutory standards of 49 U.S.C. 10904(d) for purposes of negotiations or, in exemption proceedings, for purposes of partial revocation and negotiations.

(iii) Whether:

(A) To impose, modify, or remove environmental or historic preservation conditions; and

(B) In abandonment proceedings, to impose public use conditions under 49 U.S.C. 10905 and the implementing regulations at 49 CFR 1152.28.

(iv) In abandonment proceedings, when a request for interim trail use/rail banking is filed under 49 CFR 1152.29, to determine whether the National Trails System Act, 16 U.S.C. 1247(d), is applicable and, where appropriate, to issue Certificates of Interim Trail Use or Abandonment (in application proceedings) or Notices of Interim Trail Use or Abandonment (in exemption proceedings).

(v) In any abandonment proceeding where interim trail use/rail banking is an issue, to make such findings and issue decisions as may be necessary for the orderly administration of the National Trails System Act, 16 U.S.C. 1247(d).

(vi) Whether to institute requested declaratory order proceedings under 5 U.S.C. 554(e).

(vii) To issue decisions, after 60 days' notice by any person discontinuing a subsidy established under 49 U.S.C. 10904 and at the railroad's request:

(A) In application proceedings, immediately issuing decisions authorizing abandonment or discontinuance; and

(B) In exemption proceedings, immediately vacating the decision that postponed the effective date of the exemption.

(viii) In proceedings under the Feeder Railroad Development Program under 49 U.S.C. 10907 and the implementing regulations at 49 CFR part 1151:

(A) Whether to accept or reject primary applications under 49 CFR 1151.2(b); competing applications under section 1151.2(c); and incomplete applications under 49 CFR 1151.2(d).

(B) Whether to grant waivers from specific provisions of 49 CFR part 1151.

(ix) In exemption proceedings subject to environmental or historic preservation reporting requirements, to issue a decision, under 49 CFR 1105.10(g), making a finding of no significant impact where no environmental or historic preservation issues have been raised by any party or identified by the Board's Office of Environmental Analysis.

(x) Whether to issue notices of exemption under 49 U.S.C. 10502:

(A) For acquisition, lease, and operation transactions under 49 U.S.C. 10901 and 10902 and the implementing regulations at 49 CFR part 1150, subparts D and E;

(B) For connecting track constructions under 49 U.S.C. 10901 and the implementing regulations at 49 CFR 1150.36;

(C) For rail transactions under 49 U.S.C. 11323 and the implementing regulations at 49 CFR 1180.2(d); and

(D) For abandonments and discontinuances under 49 U.S.C. 10903 and the implementing regulations at 49 CFR 1152.50.

(xi) When an application or a petition for exemption for abandonment is filed, the Director will issue a notice of that filing pursuant to 49 CFR 1152.24(e)(2) and 49 CFR 1152.60, respectively.

(xii) Whether to issue a notice of exemption under 49 U.S.C. 13541 for a

transaction under 49 U.S.C. 14303 within a motor passenger carrier corporate family that does not result in adverse changes in service levels, significant operational changes, or a change in the competitive balance with motor passenger carriers outside the corporate family.

(xiii) Whether to issue rail modified certificates of public convenience and necessity under 49 CFR part 1150, subpart C.

(xiv) Whether to waive the regulations at 49 CFR part 1152, subpart C, on appropriate petition.

(xv) To reject applications, petitions for exemption, and verified notices (filed in class exemption proceedings) for noncompliance with the environmental rules at 49 CFR part 1105.

(xvi) To reject applications by BNSF Railway Company to abandon rail lines in North Dakota exceeding the 350-mile cap of section 402 of Public Law 97–102, 95 Stat. 1465 (1981), as amended by The Department of Transportation and Related Agencies Appropriations Act, 1992, Public Law 102–143, section 343 (Oct. 28, 1991).

(xvii) To authorize parties to a proceeding before the Board, upon mutual request, to participate in mediation with a Board-appointed mediator, for a period of up to 30 days and to extend the mediation period at the mutual request of the parties.

(xviii) To authorize a proceeding to be held in abeyance while mediation procedures are pursued, pursuant to the mutual request of the parties to the matter.

(xix) To order arbitration of program-eligible matters under the Board's regulations at 49 CFR part 1108, subpart A, or upon the mutual request of parties to a proceeding before the Board.

(xx) To delegate to Board staff any necessary parties for purposes of accelerated emergency service proceedings at §1146.2 of this chapter.

(b) *Office of Public Assistance, Governmental Affairs, and Compliance.* The Office of Public Assistance, Governmental Affairs, and Compliance is delegated the authority to:

(1) Reject tariffs and railroad transportation contract summaries filed with the Board that violate applicable statutes, rules, or regulations. Any rejection of a tariff or contract summary may be by letter signed by or for the Director, Office of Public Assistance, Governmental Affairs, and Compliance.

(2) Issue, on written request, informal opinions and interpretations on carrier tariff provisions, which are not binding on the Board.

(3) Grant or withhold special tariff authority granting relief from the provisions of 49 CFR part 1312. Any grant or withholding of such relief may be by letter signed by or for the Director, Office of Public Assistance, Governmental Affairs, and Compliance.

(4) Resolve any disputes that may arise concerning the applicability of motor common carrier rates under 49 U.S.C. 13710(a)(2).

(5) Issue orders by the Director in an emergency under 49 U.S.C. 11123 and 11124 if no Board Member is reasonably available.

(6) Issue, on written request, informal opinions and interpretations which are not binding on the Board. In issuing informal opinions or interpretations, the Director of the Office of Public Assistance, Governmental Affairs, and Compliance shall consult with the Directors of the appropriate Board offices. Such requests must be directed to the Director of the Office of Public Assistance, Governmental Affairs, and Compliance, Surface Transportation Board, Washington, DC.

(7) Perform any arbitration duties specifically assigned to the Office of Public Assistance, Governmental Affairs, and Compliance or its Director in 49 CFR part 1108, subpart B.

[75 FR 30711, June 2, 2010, as amended at 78 FR 29079, May 17, 2013; 81 FR 8851, Feb. 23, 2016; 83 FR 15077, Apr. 9, 2018; 88 FR 729, Jan. 4, 2023; 89 FR 4578, Jan. 24, 2024]

## PART 1012—MEETINGS OF THE BOARD

Sec.
1012.1 General provisions.
1012.2 Time and place of meetings.
1012.3 Public notice.
1012.4 Public participation.
1012.5 Transcripts; minutes.
1012.6 Petitions seeking to open or close a meeting.
1012.7 Meetings which may be closed to the public.

KeyCite Yellow Flag
Proposed Regulation

Code of Federal Regulations
Title 49. Transportation
Subtitle B. Other Regulations Relating to Transportation
Chapter X. Surface Transportation Board (Refs & Annos)
Subchapter A. General Rules and Regulations
Parts 1000 to 1019—General Provisions
Part 1011. Board Organization; Delegations of Authority (Refs & Annos)

49 C.F.R. § 1011.7

§ 1011.7 Delegations of authority by the Board to specific offices of the Board.

Effective: February 3, 2026
Currentness

(a) Office of Chief Counsel.

(1) The Chief Counsel shall head the Office of Chief Counsel and shall also fulfill the role of the General Counsel of the Board.

(2) The Chief Counsel is delegated the authority to determine (in consultation with involved Offices) whether to waive filing fees set forth at 49 CFR 1002.2(f).

(3) In addition to the authority delegated at § 1011.6(c)(3), (d), (g), and (h), the Chief Counsel shall have authority initially to determine the following:

(i) Whether to designate abandonment proceedings for oral hearings on request.

(ii) Whether offers of financial assistance satisfy the statutory standards of 49 U.S.C. 10904(d) for purposes of negotiations or, in exemption proceedings, for purposes of partial revocation and negotiations.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(iii) Whether:

(A) To impose, modify, or remove environmental or historic preservation conditions; and

(B) In abandonment proceedings, to impose public use conditions under 49 U.S.C. 10905 and the implementing regulations at 49 CFR 1152.28.

(iv) In abandonment proceedings, when a request for interim trail use/rail banking is filed under 49 CFR 1152.29, to determine whether the National Trails System Act, 16 U.S.C. 1247(d), is applicable and, where appropriate, to issue Certificates of Interim Trail Use or Abandonment (in application proceedings) or Notices of Interim Trail Use or Abandonment (in exemption proceedings).

(v) In any abandonment proceeding where interim trail use/rail banking is an issue, to make such findings and issue decisions as may be necessary for the orderly administration of the National Trails System Act, 16 U.S.C. 1247(d).

(vi) Whether to institute requested declaratory order proceedings under 5 U.S.C. 554(e).

(vii) To issue decisions, after 60 days' notice by any person discontinuing a subsidy established under 49 U.S.C. 10904 and at the railroad's request:

(A) In application proceedings, immediately issuing decisions authorizing abandonment or discontinuance; and

(B) In exemption proceedings, immediately vacating the decision that postponed the effective date of the exemption.

(viii) In proceedings under the Feeder Railroad Development Program under 49 U.S.C. 10907 and the implementing regulations at 49 CFR part 1151:

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(A) Whether to accept or reject primary applications under 49 CFR 1151.2(b); competing applications under 49 CFR 1151.2(c); and incomplete applications under 49 CFR 1151.2(d).

(B) Whether to grant waivers from specific provisions of 49 CFR part 1151.

(ix) In exemption proceedings subject to environmental or historic preservation reporting requirements, to issue a decision, under 49 CFR 1105.10(g), making a finding of no significant impact where no environmental or historic preservation issues have been raised by any party or identified by the Board's Office of Environmental Analysis.

(x) Whether to issue notices of exemption under 49 U.S.C. 10502:

(A) For acquisition, lease, and operation transactions under 49 U.S.C. 10901 and 10902 and the implementing regulations at 49 CFR part 1150, subparts D and E;

(B) For connecting track constructions under 49 U.S.C. 10901 and the implementing regulations at 49 CFR 1150.36;

(C) For rail transactions under 49 U.S.C. 11323 and the implementing regulations at 49 CFR 1180.2(d); and

(D) For abandonments and discontinuances under 49 U.S.C. 10903 and the implementing regulations at 49 CFR 1152.50.

(xi) When an application or a petition for exemption for abandonment is filed, the Chief Counsel will issue a notice of that filing pursuant to 49 CFR 1152.24(e)(2) and 1152.60, respectively.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(xii) Whether to issue a notice of exemption under 49 U.S.C. 13541 for a transaction under 49 U.S.C. 14303 within a motor passenger carrier corporate family that does not result in adverse changes in service levels, significant operational changes, or a change in the competitive balance with motor passenger carriers outside the corporate family.

(xiii) Whether to issue rail modified certificates of public convenience and necessity under 49 CFR part 1150, subpart C.

(xiv) Whether to waive the regulations at 49 CFR part 1152, subpart C, on appropriate petition.

(xv) To reject applications, petitions for exemption, and verified notices (filed in class exemption proceedings) for noncompliance with the environmental rules at 49 CFR part 1105.

(xvi) To reject applications by BNSF Railway Company to abandon rail lines in North Dakota exceeding the 350–mile cap of section 402 of Public Law 97–102, 95 Stat. 1465 (1981), as amended by The Department of Transportation and Related Agencies Appropriations Act, 1992, Public Law 102–143, section 343 (Oct. 28, 1991).

(xvii) To authorize parties to a proceeding before the Board, upon mutual request, to participate in mediation with a Board-appointed mediator, for a period of up to 30 days and to extend the mediation period at the mutual request of the parties.

(xviii) To authorize a proceeding to be held in abeyance while mediation procedures are pursued, pursuant to the mutual request of the parties to the matter.

(xix) To order arbitration of program-eligible matters under the Board's regulations at 49 CFR part 1108, subpart A, or upon the mutual request of parties to a proceeding before the Board.

(xx) To delegate to Board staff any necessary parties for purposes of accelerated emergency service proceedings at 49 CFR 1146.2.

(b) Office of Public Assistance, Governmental Affairs, and Compliance. The Office of Public Assistance, Governmental Affairs, and Compliance is delegated the authority to:

(1) Reject tariffs and railroad transportation contract summaries filed with the Board that violate applicable statutes, rules, or regulations. Any rejection of a tariff or contract summary may be by letter signed by or for the Director, Office of Public Assistance, Governmental Affairs, and Compliance.

(2) Issue, on written request, informal opinions and interpretations on carrier tariff provisions, which are not binding on the Board.

(3) Grant or withhold special tariff authority granting relief from the provisions of 49 CFR part 1312. Any grant or withholding of such relief may be by letter signed by or for the Director, Office of Public Assistance, Governmental Affairs, and Compliance.

(4) Resolve any disputes that may arise concerning the applicability of motor common carrier rates under 49 U.S.C. 13710(a)(2).

(5) Issue orders by the Director in an emergency under 49 U.S.C. 11123 and 11124 if no Board Member is reasonably available.

(6) Issue, on written request, informal opinions and interpretations which are not binding on the Board. In issuing informal opinions or interpretations, the Director of the Office of Public Assistance, Governmental Affairs, and Compliance shall consult with the Directors of the appropriate Board offices. Such requests must be directed to the Director of the Office of Public Assistance, Governmental Affairs, and Compliance, Surface Transportation Board, Washington, DC.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(7) Perform any arbitration duties specifically assigned to the Office of Public Assistance, Governmental Affairs, and Compliance or its Director in 49 CFR part 1108, subpart B.

**Credits**

[68 FR 8726, Feb. 25, 2003; 74 FR 4720, Jan. 27, 2009; 74 FR 52904, Oct. 15, 2009; 75 FR 30711, June 2, 2010; 78 FR 29079, May 17, 2013; 81 FR 8851, Feb. 23, 2016; 83 FR 15077, April 9, 2018; 88 FR 729, Jan. 4, 2023; 89 FR 4578, Jan. 24, 2024; 91 FR 4851, Feb. 3, 2026]

SOURCE: 67 FR 60167, Sept. 25, 2002; 68 FR 8726, Feb. 25, 2003; 81 FR 33416, May 26, 2016; 83 FR 15077, April 9, 2018, unless otherwise noted.

AUTHORITY: 5 U.S.C. 553; 31 U.S.C. 9701; 49 U.S.C. 1301, 1321, 11123, 11124, 11144, 14122, and 15722.

Current through July 20, 2026, 91 FR 45513. Some sections may be more current. See credits for details.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 49. Transportation
Subtitle B. Other Regulations Relating to Transportation
Chapter X. Surface Transportation Board (Refs & Annos)
Subchapter B. Rules of Practice
Parts 1100 to 1129—Rules of General Applicability
Part 1101. Definitions and Construction (Refs & Annos)

49 C.F.R. § 1101.2

# § 1101.2 Definitions applicable to this subchapter.

Effective: March 25, 2016
Currentness

(a) "Act" or "Interstate Commerce Act" means subtitle IV of title 49 of the United States Code (49 U.S.C. 10101 et seq.).

(b) "Board" means (1) the Surface Transportation Board and (2) any body or individual to which or to whom decision making authority is assigned by the Board or the Chairman of the Board, including the Chairman, another Board Member, employee board, an individual employee, an administrative law judge, or other hearing officer entitled to act in a particular proceeding. See 49 CFR part 1011, Board Organization; Delegations of Authority.

(c) "Decision" means any formal, published action of the Board, including orders and notices.

(d) "Party" means a complainant, defendant, applicant, respondent, protestant, intervener, or petitioner in any proceeding, or other persons permitted or directed by the Board to participate in a proceeding. It will not include persons merely signing certificates of support or witnesses at oral hearing or in modified procedure proceedings, unless they are otherwise a party to the proceeding. Persons on the docket service list merely for the purpose of receiving copies of Board releases are not considered parties to the proceeding.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(e) “Proceeding” includes:

(1) An “informal complaint” filed under 49 CFR 1130.1, or 1130.2 or a “formal complaint” alleging violation of any provision of the Act or of any regulation or requirement made pursuant to a power granted by such Act, including petitions on special dockets;

(2) An “application” for (i) the granting of any right, privilege, authority, or relief under or from any provision of the Act or of any regulation or requirement made pursuant to a power granted by such Act, or (ii) the consideration of any submission required by law to be made to the Board;

(3) An “investigation” instituted by the Board;

(4) A “rulemaking” proposal instituted by the Board; or

(5) A petition for exemption filed under 49 U.S.C. 10502 requesting the Board to exempt from application all or part of subtitle IV of title 49 of the United States Code any person, class of persons, transaction, or service related to a rail carrier.

**Credits**

[50 FR 30275, July 25, 1985; 64 FR 53267, Oct. 1, 1999; 69 FR 58365, Sept. 30, 2004; 81 FR 8852, Feb. 23, 2016]

SOURCE: 47 FR 49548, Nov. 1, 1982; 62 FR 50524, Sept. 26, 1997; 81 FR 33416, May 26, 2016; 83 FR 15078, April 9, 2018, unless otherwise noted.

AUTHORITY: 49 U.S.C. 1321.

Notes of Decisions (1)

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Code of Federal Regulations
Title 49. Transportation
Subtitle B. Other Regulations Relating to Transportation
Chapter X. Surface Transportation Board (Refs & Annos)
Subchapter B. Rules of Practice
Parts 1100 to 1129—Rules of General Applicability
Part 1104. Filing with the Board–Copies–Verification–Service–Pleadings, Generally (Refs & Annos)

49 C.F.R. § 1104.13

§ 1104.13 Replies and motions.

Currentness

(a) Time. A party may file a reply or motion addressed to any pleading within 20 days after the pleading is filed with the Board, unless otherwise provided.

(b) Number of copies. The original of a reply or motion should be accompanied by the same number of copies required to be filed with the pleading to which the reply or motion is addressed.

(c) Reply to a Reply. A reply to a reply is not permitted.

**Credits**
[61 FR 52711, Oct. 8, 1996; 61 FR 57340, Nov. 6, 1996]

SOURCE: 47 FR 49554, Nov. 1, 1982; 54 FR 48250, Nov. 22, 1989; 55 FR 11203, March 27, 1990; 61 FR 52711, Oct. 8, 1996; 67 FR 5514, Feb. 6, 2002; 81 FR 33416, May 26, 2016; 82 FR 57378, Dec. 5, 2017, unless otherwise noted.

AUTHORITY: 5.U.S.C. 553 and 559; 18 U.S.C. 1621; and 49 U.S.C. 1321.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Notes of Decisions (1)

Current through August 31, 2026, 91 FR 55815. Some sections may be more current. See credits for details.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 49. Transportation
Subtitle B. Other Regulations Relating to Transportation
Chapter X. Surface Transportation Board (Refs & Annos)
Subchapter B. Rules of Practice
Parts 1150 to 1174—Licensing Procedures
Parts 1150 to 1159—Rail Licensing Procedures
Part 1152. Abandonment and Discontinuance of Rail Lines and Rail Transportation Under 49 U.S.C. 10903 (Refs & Annos)
Subpart C. Procedures Governing Notice, Applications, Financial Assistance, Acquisition for Public Use, and Trail Use

49 C.F.R. § 1152.29

§ 1152.29 Prospective use of rights-of-way for interim trail use and rail banking.

Effective: February 3, 2026
Currentness

(a) Contents of request for interim trail use. If any state, political subdivision, or qualified private organization is interested in acquiring or using a right-of-way of a rail line proposed to be abandoned for interim trail use and rail banking pursuant to 16 U.S.C. 1247(d), it must file a comment or otherwise include a request in its filing (in a regulated abandonment proceeding) or a petition (in an exemption proceeding) indicating that it would like to do so. The comment/request or petition must include:

(1) A map depicting, and an accurate description of, the right-of-way, or portion thereof (including mileposts), proposed to be acquired or used;

(2) A statement indicating the trail sponsor's willingness to assume full responsibility for:

(i) Managing the right-of-way;

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(ii) Any legal liability arising out of the transfer or use of the right-of-way (unless the user is immune from liability, in which case it need only indemnify the railroad against any potential liability); and

(iii) The payment of any and all taxes that may be levied or assessed against the right-of-way; and

(3) An acknowledgment that interim trail use is subject to the sponsor's continuing to meet its responsibilities described in paragraph (a)(2) of this section, and subject to possible future reconstruction and reactivation of the right-of-way for rail service. The statement must be in the following form:

**Statement of Willingness To Assume Financial Responsibility**

In order to establish interim trail use and rail banking under 16 U.S.C. 1247(d) and 49 CFR 1152.29 with respect to the right-of-way owned by ________ (Railroad) and operated by ________ (Railroad), ________ (Interim Trail Sponsor) is willing to assume full responsibility for: (1) Managing the right-of-way, (2) any legal liability arising out of the transfer or use of the right-of-way (unless the sponsor is immune from liability, in which case it need only indemnify the railroad against any potential liability), and (3) the payment of any and all taxes that may be levied or assessed against the right of way. The property, known as ________ (Name of Branch Line), extends from railroad milepost ________ near ________(Station Name), to railroad milepost ______, near ________ (Station name), a distance of ______ miles in [County(ies), (State(s) ]. The right-of-way is part of a line of railroad proposed for abandonment in Docket No. STB AB ________ (Sub–No. ________). A map of the property depicting the right-of-way is attached.

________ (Interim Trail Sponsor) acknowledges that use of the right-of-way is subject to the sponsor's continuing to meet its responsibilities described above and subject to possible future reconstruction and reactivation of the right-of-way for rail service. A copy of this statement is being served on the railroad(s) on the same date it is being served on the Board.

(b) When to file.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(1) In abandonment application proceedings under 49 U.S.C. 10903, interim trail use statements are due within the 45-day protest and comment period following the date the abandonment application is filed. See § 1152.25(c). The applicant carrier's response notifying the Board whether and with whom it intends to negotiate a trail use agreement is due within 15 days after the close of the protest and comment period (i.e., 60 days after the abandonment application is filed).

(i) In every proceeding where a Trails Act request is made, the Board will determine whether the Trails Act is applicable.

(ii) If the Trails Act is not applicable because of failure to comply with paragraph (a) of this section, or is applicable but the carrier either does not intend to negotiate an agreement, or does not timely notify the Board of its intention to negotiate, a decision on the merits will be issued and no Certificate of Interim Trail Use or Abandonment (CITU) will be issued. If the carrier is willing to negotiate an agreement, and the public convenience and necessity permit abandonment, the Board will issue a CITU.

(2) In exemption proceedings, a petition containing an interim trail use statement is due within 10 days after the date the notice of exemption is published in the Federal Register in the case of a class exemption and within 20 days after publication in the Federal Register of the notice of filing of a petition for exemption in the case of a petition for exemption. When an interim trail use comment(s) or petition(s) is filed in an exemption proceeding, the railroad's reply to the Board (indicating whether and with whom it intends to negotiate an agreement) is due within 10 days after the date a petition requesting interim trail use is filed.

(3) Late-filed trail use statements must be supported by a statement showing good cause for late filing.

(c) Abandonment application proceedings.

(1) In abandonment application proceedings, if continued rail service does not occur pursuant to 49 U.S.C. 10904 and § 1152.27, and a railroad agrees to negotiate an interim trail use/railbanking agreement, then the Board will issue a CITU to the

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

railroad and to the interim trail sponsor for that portion of the right-of-way as to which both parties are willing to negotiate.

(i) The CITU will permit the railroad to discontinue service, cancel any applicable tariffs, and salvage track and material consistent with interim trail use and railbanking, as long as such actions are consistent with any other Board order, 30 days after the date the CITU is issued; and permit the railroad to fully abandon the line if no interim trail use agreement is reached within one year from the date on which the CITU is issued, subject to appropriate conditions, including labor protection and environmental matters.

(ii) Parties may request a Board order to extend, for one-year periods, the interim trail use negotiation period. Up to three one-year extensions of the initial period may be granted if the trail sponsor and the railroad agree. Additional one-year extensions, beyond three extensions of the initial period, are not favored but may be granted if the trail sponsor and the railroad agree and extraordinary circumstances are shown.

(2) The CITU will indicate that any interim trail use is subject to future restoration of rail service and to the sponsor's continuing to meet its responsibilities described in paragraph (a)(2) of this section. The CITU will also provide that, if an interim trail use agreement is reached (and thus interim trail use established), the parties shall file the notice described in paragraph (h) of this section. Additionally, the CITU will provide that if the sponsor intends to terminate interim trail use on all or any portion of the right-of-way covered by the interim trail use agreement, it must send the Board a copy of the CITU and request that it be vacated on a specified date. If a party requests that the CITU be vacated for only a portion of the right-of-way, the Board will issue an appropriate replacement CITU covering the remaining portion of the right-of-way subject to the interim trail use agreement. The Board will reopen the abandonment proceeding, vacate the CITU, and issue a decision permitting immediate abandonment for the involved portion of the right-of-way. Copies of the decision will be sent to:

(i) The abandonment applicant;

(ii) The owner of the right-of-way; and

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(iii) The current trail sponsor.

(3) If an application to construct and operate a rail line over the right-of-way is authorized under 49 U.S.C. 10901 and part 1150 of this title, or exempted under 49 U.S.C. 10502, then the CITU will be vacated accordingly.

(d) Abandonment exemption proceedings.

(1) In abandonment exemption proceedings, if continued rail service does not occur under 49 U.S.C. 10904 and § 1152.27, and a railroad agrees to negotiate an interim trail use/railbanking agreement, then the Board will issue a Notice of Interim Trail Use or Abandonment (NITU) to the railroad and to the interim trail sponsor for the portion of the right-of-way as to which both parties are willing to negotiate.

(i) The NITU will permit the railroad to discontinue service, cancel any applicable tariffs, and salvage track and materials, consistent with interim trail use and railbanking, as long as such actions are consistent with any other Board order, 30 days after the date the NITU is issued; and permit the railroad to fully abandon the line if no interim trail use agreement is reached within one year from the date on which the NITU is issued, subject to appropriate conditions, including labor protection and environmental matters.

(ii) Parties may request a Board order to extend, for one-year periods, the interim trail use negotiation period. Up to three one-year extensions of the initial period may be granted if the trail sponsor and railroad agree. Additional one-year extensions, beyond three extensions of the initial period, are not favored but may be granted if the trail sponsor and railroad agree and extraordinary circumstances are shown.

(2) The NITU will indicate that interim trail use is subject to future restoration of rail service and to the sponsor's continuing to meet its responsibilities described in paragraph (a)(2) of this section. The NITU will also provide that, if an interim trail use agreement is reached (and thus interim trail use established), the parties shall file the notice described in paragraph (h) of this section. Additionally, the NITU

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

will provide that if the sponsor intends to terminate interim trail use on all or any portion of the right-of-way covered by the interim trail use agreement, it must send the Board a copy of the NITU and request that it be vacated on a specific date. If a party requests that the NITU be vacated for only a portion of the right-of-way, the Board will issue an appropriate replacement NITU covering the remaining portion of the right-of-way subject to the interim trail use agreement. The Board will reopen the exemption proceeding, vacate the NITU, and issue a decision reinstating the exemption for that portion of the right-of-way. Copies of the decision will be sent to:

(i) The abandonment exemption applicant;

(ii) The owner of the right-of-way; and

(iii) The current trail sponsor.

(3) If an application to construct and operate a rail line over the right-of-way is authorized under 49 U.S.C. 10901 and part 1150 of this title, or exempted under 49 U.S.C. 10502, then the NITU will be vacated accordingly.

(e) Late-filed requests; notices of consummation.

(1) Where late-filed trail use statements are accepted, the Chief Counsel (or designee) will telephone the railroad to determine whether abandonment has been consummated and, if not, whether the railroad is willing to negotiate an interim trail use agreement. The railroad shall confirm, in writing, its response, within 5 days. If abandonment has been consummated, the trail use request will be dismissed. If abandonment has not been consummated but the railroad refuses to negotiate, then trail use will be denied. If abandonment has not been consummated and the railroad is willing to negotiate, the abandonment proceeding will be reopened, the abandonment decision granting an application, petition for exemption or notice of exemption will be vacated, and an appropriate CITU or NITU will be issued. The effective date of the CITU or NITU will be the same date as the vacated decision or notice.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(2) A railroad that receives authority from the Board to abandon a line (in a regulated abandonment proceeding under 49 U.S.C. 10903, or by individual or class exemption issued under 49 U.S.C. 10502) shall file a notice of consummation with the Board to signify that it has exercised the authority granted and fully abandoned the line (e.g., discontinued operations, salvaged the track, canceled tariffs, and intends that the property be removed from the interstate rail network). The notice shall provide the name of the STB proceeding and its docket number, a brief description of the line, and a statement that the railroad has consummated, or fully exercised, the abandonment authority on a certain date. The notice shall be filed within 1 year of the service date of the decision permitting the abandonment (assuming that the railroad intends to consummate the abandonment). Notices will be deemed conclusive on the point of consummation if there are no legal or regulatory barriers to consummation (such as outstanding conditions, including Trails Act conditions). If, after 1 year from the date of service of a decision permitting abandonment, consummation has not been effected by the railroad's filing of a notice of consummation, and there are no legal or regulatory barriers to consummation, the authority to abandon will automatically expire. In that event, a new proceeding would have to be instituted if the railroad wants to abandon the line. Copies of the railroad's notice of consummation shall be filed with the Chief of Case Administration, Office of Chief Counsel. In addition, the notice of consummation shall be sent to the State Public Service Commission (or equivalent agency) of every state through which the line passes. If, however, any legal or regulatory barrier to consummation exists at the end of the 1–year time period, the notice of consummation must be filed not later than 60 days after satisfaction, expiration or removal of the legal or regulatory barrier. For good cause shown, a railroad may file a request for an extension of time to file a notice so long as it does so sufficiently in advance of the expiration of the deadline for notifying the Board of consummation to allow for timely processing.

(f) Substitution of trail user.

(1) When a trail user intends to terminate trail use and another person intends to become a trail user by assuming financial responsibility for the right-of-way, then the existing and future trail users shall file, jointly:

(i) A copy of the extant CITU or NITU; and

(ii) A Statement of Willingness to Assume Financial Responsibility by the new trail user.

(iii) An acknowledgement that interim trail use is subject to possible future reconstruction and reactivation of the right-of-way for rail service.

(2) The parties shall indicate the date on which responsibility for the right-of-way is to transfer to the new trail user. The Board will reopen the abandonment or exemption proceeding, vacate the existing NITU or CITU; and issue an appropriate replacement NITU or CITU to the new trail user.

(g) Consent after Board decision or notice. In proceedings where a timely trail use statement is filed, but due to either the railroad's indication of its unwillingness to negotiate interim trail use agreement, or its failure to timely notify the Board of its willingness to negotiate, a decision authorizing abandonment or an exemption notice or decision is issued instead of a CITU or NITU, and subsequently the railroad and trail use proponent nevertheless determine to negotiate an interim trail use agreement under the Trails Act, then the railroad and trail use proponent must file a joint pleading requesting that an appropriate CITU or NITU be issued. If the abandonment has not been consummated, the Board will reopen the proceeding, vacate the outstanding decision or notice (or portion thereof), and issue an appropriate CITU or NITU that will permit the parties to negotiate for a period agreed to by the parties in their joint filing, but not to exceed one year, at the end of which, the CITU or NITU will convert into a decision or notice permitting abandonment.

(h) Notice of interim trail use agreement reached. When the parties negotiating for rail banking/interim trail use reach an agreement, the trail sponsor and railroad shall jointly notify the Board within 10 days that the agreement has been reached. The notice shall include a map depicting, and an accurate description of, the involved right-of-way or portion thereof (including mileposts) that is subject to the parties' interim trail use agreement and a certification that the interim trail use agreement includes provisions requiring the sponsor to fulfill the responsibilities described in paragraph (a)(2) of this section. Additionally, if the interim trail use agreement establishes interim trail use over less of the right-of-way than is covered by the CITU or NITU, the notice shall also include a request that the Board vacate the CITU or NITU and issue a replacement CITU/NITU for only the portion of the right-of-way covered by the interim trail use

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

agreement. The Board will reopen the abandonment proceeding, vacate the CITU or NITU, issue an appropriate replacement CITU or NITU for only the portion of the right-of-way covered by the interim trail use agreement, and issue a decision permitting immediate abandonment of the portion of the right-of-way not subject to the interim trail use agreement. Copies of the decision will be sent to:

(1) The rail carrier that sought abandonment authorization;

(2) The owner of the right-of-way; and

(3) The current trail sponsor.

**Credits**

[62 FR 34670, June 27, 1997; 64 FR 53268, Oct. 1, 1999; 74 FR 52910, Oct. 15, 2009; 77 FR 25914, May 2, 2012; 84 FR 66325, Dec. 4, 2019]

SOURCE: 61 FR 67883, Dec. 24, 1996; 63 FR 28290. May 22, 1998; 81 FR 33416, May 26, 2016; 82 FR 31007, July 5, 2017; 91 FR 4855, Feb. 3, 2026, unless otherwise noted.

AUTHORITY: 11 U.S.C. 1170; 16 U.S.C. 1247(d) and 1248; 45 U.S.C. 744; and 49 U.S.C. 1301, 1321(a), 10502, 10903–10905, and 11161.

Notes of Decisions (155)

Current through July 20, 2026, 91 FR 45513. Some sections may be more current. See credits for details.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.